731 F.2d 775
 1986 A.M.C. 731
 Van HARVILLE, et al., Plaintiffs-Appellants,
v.
JOHNS-MANVILLE PRODUCTS CORP., et al., Defendants-Appellees.
JOHNS-MANVILLE SALES CORP., et al., Third Party-Plaintiffs-Appellants,
v.
YARWAY CORPORATION, et al., Third Party-Defendants-Appellees.
 Nos. 82-7167, 82-7197.
 United States Court of Appeals,
Eleventh Circuit.
 May 7, 1984.
 
 Roy C. Williams, Pascagoula, Miss., Michael J. McElhaney, Jr., Lively M. Wilson, Louisville, Ky., Donald F. Pierce, Mobile, Ala., for Johns-Manville.
 Jasper P. Juliano, Jack J. Hall., Birmingham, Ala., for Yarway Corp.
 Horace Moon, Jr., Mobile, Ala., for Hopeman Brothers.
 Christopher G. Hume, III, Joe H. Little, Jr., Mobile, Ala., for J.P. Stevens & Co., Inc.
 J. Jerry Langford, Clifford K. Bailey, III, Jackson, Miss., for Amatex Corp.
 James A. Philips, Mobile, Ala., for John Crane Houdaville, Inc.
 Robert N. Kelly, Washington, D.C., for United States.
 William L. Lee, III, Alan C. Livingston, Dothan, Ala., for Darcoid Co.
 Timothy P. McMahon, Mobile, Ala., for Garlock, Inc.
 Robert A. Huffaker, Montgomery, Ala., for Sepco-Corp.
 E. Elliott Barker, Mobile, Ala., John M. Toriello, Stephen K. Carr, New York City, for Owens Illinois, Inc.
 Robert Smith, Mobile, Ala., for Nicolet, Inc.
 Peter V. Sintz and Mary Beth Mantiply, Mobile, Ala., for Celotex Corp.
 Larry W. Harper, Birmingham, Ala., for Pittsburg Corning.
 Thomas W. Tardy, Jackson, Miss., Beth McFadden Rouse, Mobile, Ala., for Combustion Engineering.
 John N. Leach, Jr., E.L. McCafferty, Mobile, Ala., for Eagle Picher.
 W. Michael Atchison, Birmingham, Ala., for Raybestos-Manhattan (Raymark Industries, Inc.).
 Wes Pipes, Walter M. Cook, Jr., Mobile, Ala., for Forty-Eight Insulations, Inc.
 James H. Crosby, Vincent A. Noletto, Jr., Mobile, Ala., for Owens Corning Fiberglass Corp.
 Frank Grey Reddit, Jr., Mobile, Ala., for H.K. Porter Co.
 Richard F. Pate, Pate & Peters, Mobile, Ala., for plaintiffs-appellants.
 Appeals from the United States District Court for the Southern District of Alabama.
 Before KRAVITCH, JOHNSON and HATCHETT, Circuit Judges.
 JOHNSON, Circuit Judge:
 
 
 1
 This case involves the question whether the maritime jurisdiction of the federal courts encompasses damage claims by land-based ship repair workers against manufacturers and distributors of asbestos products for injuries allegedly induced by exposure to air-borne asbestos fibres. We hold that, because the plaintiffs' claims have insufficient nexus to the traditional concerns of maritime law and because exercise of federal maritime jurisdiction would not advance the policies behind a uniform federal law of admiralty, maritime jurisdiction does not extend to these claims.
 
 I. THE FACTUAL BACKGROUND
 
 2
 This is one of thousands of suits that workers throughout the nation in a variety of occupations have filed seeking compensation for asbestos-related injuries. The plaintiffs are all past or present employees of the Alabama Dry Dock and Shipbuilding Company ("ADDSCO") who worked at ADDSCO's Mobile, Alabama, shipyard. Most of them were employed there for between twenty and forty years. The plaintiffs worked as insulators, pipe-fitters, welders, boilermakers, machinists, foremen, and general laborers in the construction and repair of vessels. Since World War II, the shipyard and most of the plaintiffs have been employed in ship repair and refitting rather than in new vessel construction. The plaintiffs' duties included either tearing out and replacing asbestos insulation or working in a place where insulation was being replaced. During such work they received heavy exposure to, and breathed in large amounts of, air-borne asbestos dust.
 
 
 3
 The plaintiffs allege that they now suffer a variety of pulmonary diseases as a result of their exposure to asbestos. The former Fifth Circuit described the pathology of one such condition in Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1083 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974):
 
 
 4
 The medical testimony adduced at trial indicates that inhaling asbestos dust in industrial conditions, even with relatively light exposure, can produce the disease of asbestosis. The disease is difficult to diagnose in its early stages because there is a long latent period between initial exposure and apparent effect. This latent period may vary according to individual idiosyncrasy, duration and intensity of exposure, and the type of asbestos used. In some cases, the disease may manifest itself in less than ten years after initial exposure. In general, however, it does not manifest itself until ten to twenty-five or more years after initial exposure. This latent period is explained by the fact that asbestos fibers, once inhaled, remain in place in the lung, causing a tissue reaction that is slowly progressive and apparently irreversible. Even if no additional asbestos fibers are inhaled, tissue changes may continue undetected for decades. By the time the disease is diagnosable, a considerable period of time has elapsed since the date of the injurious exposure. Furthermore, the effect of the disease may be cumulative since each exposure to asbestos dust can result in additional tissue changes. A worker's present condition is the biological product of many years of exposure to asbestos dust, with both past and recent exposures contributing to the overall effect. All of these factors combine to make it impossible, as a practical matter, to determine which exposure or exposures to asbestos dust caused the disease.
 
 
 5
 (footnote omitted). Asbestos-related disease is debilitating and often fatal.
 
 
 6
 The plaintiffs seek compensation from a number of manufacturers and distributors of asbestos products. They allege that the defendants knew, or should have known, of the dangers associated with exposure to their products. The plaintiffs further allege that the defendants failed to warn them or their employer of the risks of asbestos exposure or of safety measures that might have been taken to minimize those risks. The plaintiffs claim that the defendants' acts and omissions directly caused their injuries.
 
 II. THE PROCEEDINGS BELOW
 
 7
 Harville and other named plaintiffs filed the complaint that began this litigation on November 22, 1978. The original complaint based jurisdiction on diversity, 28 U.S.C.A. Sec. 1332, and asserted only state law causes of action. The magistrate to whom the case was referred ordered the plaintiffs to file written notice of which, if any, of their claims "are governed by the substantive law of admiralty." The plaintiffs complied by filing a statement contending that "all of their claims are governed by the substantive law of admiralty." At the same time, they filed an objection to the magistrate's order, which made clear that their statement of applicable law should not be construed as an election of admiralty procedures under Fed.R.Civ.P. 9(h). Subsequently, the plaintiffs amended their complaint to assert only tort-based theories of recovery and added several claims for relief based explicitly on federal maritime law.
 
 
 8
 Because the determination of a number of pending motions required prior resolution of the choice of law issue, the magistrate scheduled a hearing under Fed.R.Civ.P. 16 at which the plaintiffs would be required to produce evidence in support of a "prima facie" case for the applicability of admiralty law. The magistrate advised the parties that he intended at the end of this hearing to render a finding of whether the plaintiffs had made out a case for the application of admiralty law. If this finding was adverse to the defendants, they would be permitted to rebut the prima facie case. On March 13, 1981, after conducting the Rule 16 proceedings, the magistrate rendered a "Determination ... of Applicable Law." The magistrate analyzed the choice of law question under the two-part jurisdictional test of Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed. 454 (1972). He found that the plaintiffs' claims met the requirement that "the wrong bear a significant relationship to traditional maritime activity," id. at 268, 93 S.Ct. at 504, because of the importance of the plaintiffs' employment to maritime commerce. Nevertheless he held admiralty jurisdiction inapplicable because the "locality" test, that is the requirement that the wrong occur on navigable waters, is not met where the plaintiff suffers an injury resulting from exposures that occurred on land as well as over water. Moreover, the magistrate invoked the "maritime and local" doctrine to substitute state for federal substantive law because of the local nature of the dispute. On November 2, 1981, the district court vacated and remanded the magistrate's order for reconsideration in light of the Fourth Circuit's decision in White v. Johns-Manville Corp., 662 F.2d 234 (4th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982), which held maritime jurisdiction to apply in a similar factual context. Upon reconsideration, the magistrate essentially adhered to his previous position.
 
 
 9
 Consistent with his conclusion that the substantive law of Alabama, rather than federal maritime law, applied to the plaintiffs' claims, the magistrate issued a recommendation that, because Alabama law does not allow contribution among joint tort-feasors, Consolidated Pipe & Supply Co. v. Stockham Valves & Fittings, Inc., 365 So.2d 968, 970 (Ala.1978), certain third-party claims based on contribution theories be dismissed for failure to state a claim upon which relief can be granted. On April 13, 1982, the district court adopted the magistrate's recommendation and dismissed the contribution-based claims. The court certified its order as a final judgment under Fed.R.Civ.P. 54(b). The plaintiffs and third-party plaintiffs filed timely notices of appeal. On May 17, 1982, the district court adopted the magistrate's recommendation that the plaintiffs' ninth, tenth, eleventh, and twelfth claims for relief, all of which were predicated on federal admiralty law, be dismissed. The court entered its order to that effect as a final judgment under Rule 54(b). The plaintiffs filed a timely notice of appeal. The defendants filed notices of cross-appeal challenging the district court's adoption of the magistrate's finding that the claims bore a significant relationship to maritime activity. We consolidated the appeals of the district court's April 13 and May 17 orders.
 
 III. FRAMING THE ISSUE
 
 10
 The issue here is properly stated as one of choice of law rather than of jurisdiction. The defendants have properly invoked the diversity jurisdiction of the federal courts. 28 U.S.C.A. Sec. 1332. They nevertheless ask this Court to apply the substantive federal law of admiralty, rather than the law of Alabama, to their claims.[1] The plaintiffs have refrained from asserting admiralty jurisdiction, 28 U.S.C.A. Sec. 1333(1), apparently in order to obtain a jury trial, which, although not generally available in admiralty, can be had if there is also a basis for diversity jurisdiction. Fitzgerald v. United States Lines Co., 374 U.S. 16, 83 S.Ct. 1646, 10 L.Ed.2d 720 (1963); Romero v. Bethlehem Steel Corp., 515 F.2d 1249, 1252 (5th Cir.1975).
 
 
 11
 The answer to the question whether admiralty jurisdiction could apply is important to the choice of law issue, however. "[W]hile jurisdiction to decide the litigation may be concurrent with state courts or invoked in a federal court on some independent basis," if the dispute is also within the scope of admiralty jurisdiction, "maritime law determines the rights of the parties." Continental Casualty Co. v. Canadian Universal Insurance Co., 605 F.2d 1340, 1344 (5th Cir.1979),[2] cert. denied, 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980); Branch v. Schumann, 445 F.2d 175, 177-78 (5th Cir.1971). Without allowing ourselves to be swept into the maelstrom that has formed around the issue of the supremacy of federal maritime law, see Southern Pacific Co. v. Jensen, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917), and its progeny, it is sufficient to state that for our purposes the analysis necessary to determine whether state or admiralty law governs parallels the analysis necessary to determine whether these claims fall within the maritime jurisdiction of the federal courts.[3]
 
 IV. ADMIRALTY JURISDICTION
 A. The Analytical Framework
 
 12
 Article II, Section 2, of the United States Constitution extends the judicial power of the United States "to all Cases of admiralty and maritime Jurisdiction." Congress has effectuated the constitutional grant in 28 U.S.C.A. Sec. 1333(a), which vests federal district courts with original and exclusive jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled." Because exercise of admiralty jurisdiction and invocation of substantive maritime law may tend to preempt state regulation of matters traditionally within the ambit of local control, the courts have preferred to read congressional grants of admiralty jurisdiction restrictively.
 
 
 13
 The power reserved to the states, under the Constitution, to provide for the determination of controversies in their courts may be restricted only by the action of Congress in conformity to the judiciary sections of the Constitution .... Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which [a federal] statute has defined.
 
 
 14
 Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 272-73, 93 S.Ct. 493, 506-507, 34 L.Ed.2d 454 (1972), quoting Victory Carriers, Inc. v. Law, 404 U.S. 202, 212, 92 S.Ct. 418, 425, 30 L.Ed.2d 383 (1971); Boudloche v. Conoco Oil Corp., 615 F.2d 687, 688 (5th Cir.1980).
 
 
 15
 Prior to 1972, many federal courts had employed a strict "location-only" test in determining whether a tort claim was subject to the maritime jurisdiction of the United States.[4] E.g., Grant Smith-Porter Ship Co. v. Rohde, 257 U.S. 469, 476, 42 S.Ct. 157, 158, 66 L.Ed. 321 (1922); Weinstein v. Eastern Airlines, 316 F.2d 758, 765 (3d Cir.1963) (airplane crash into navigable waters within maritime jurisdiction). This test involved a rather mechanical and sterile analysis aimed at determining whether the "wrong and injury complained of [was] committed wholly upon the high seas or navigable waters, or, at least, the substance and consummation of the same [took] place upon these waters."[5] The Plymouth, 70 U.S. (3 Wall.) 20, 35, 18 L.Ed. 125 (1886). On the other hand, the Fifth Circuit had expressed doubts about a jurisdictional test that considered only the situs of the tort. See Peytavin v. Government Employees Insurance Co., 453 F.2d 1121, 1127 (5th Cir.1972); Watz v. Zapata Off-Shore Co., 431 F.2d 100, 110-11 (5th Cir.1970).
 
 
 16
 The Supreme Court rejected the "location-only" test in Executive Jet Aviation, Inc. v. City of Cleveland, supra. That case involved a private jet that lost power while attempting to take off from the Cleveland municipal airport when its engines scooped up a flock of seagulls. This mishap caused the plane to drop into the waters of Lake Erie and sink. The plaintiffs, owners of the plane, sought to invoke the admiralty jurisdiction of the federal courts in suing the City and others for damages. The Court rejected the plaintiffs' contention that it should focus only on the place where the damage occurred. Instead, it held that
 
 
 17
 [i]t is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the absence of legislation to the contrary.
 
 
 18
 409 U.S. at 268, 93 S.Ct. at 504. Thus the Court added to the traditional maritime "situs" or "location" requirement an additional condition for admiralty jurisdiction--that the wrong bear a "significant relationship to traditional maritime activity." In applying its new "nexus" or "status" test, the Court held that "there is no federal admiralty jurisdiction over aviation tort claims arising from flights by land-based aircraft between points within the continental United States." Id. at 274, 93 S.Ct. at 507. Such claims, held the Court, have no relationship to the traditional concerns of admiralty:
 
 
 19
 The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules--rules that govern the manner and direction those vessels may rightly move upon the waters. When a collision occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage.
 
 
 20
 Id. at 269-70, 93 S.Ct. at 505.
 
 
 21
 The Supreme Court carefully limited its holding to aviation tort claims, but its rationale applied to any type of tort. Shortly after Executive Jet, the Fifth Circuit held the new nexus requirement applicable in all tort cases. Kelly v. Smith, 485 F.2d 520, 524 (5th Cir.1973), cert. denied, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). The Supreme Court approved that construction in Foremost Insurance Co. v. Richardson, 457 U.S. 668, 673, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982).
 
 
 22
 Within the past three years, five other Courts of Appeals have had occasion to apply the Executive Jet test in shipyard worker asbestos cases. Lowe v. Ingalls Shipbuilding, 723 F.2d 1173 (5th Cir.1984); Austin v. Unarco Industries, Inc., 705 F.2d 1 (1st Cir.), cert. dismissed, --- U.S. ----, 104 S.Ct. 34, 77 L.Ed.2d 1454 (1983); Keene Corp. v. United States, 700 F.2d 836 (2d Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 195, 78 L.Ed.2d 171 (1983); Owens-Illinois v. United States District Court, 698 F.2d 967 (9th Cir.1983); Glover v. Johns-Manville Corp., 662 F.2d 225 (4th Cir.1981); White v. Johns-Manville Corp., 662 F.2d 234 (4th Cir.1981), cert. denied, 454 U.S. 1163, 102 S.Ct. 1037, 71 L.Ed.2d 319 (1982) ("White II"); White v. Johns-Manville Corp., 662 F.2d 243 (4th Cir.1981) ("White I"). Only the Fourth Circuit has held admiralty jurisdiction applicable to the personal injury claims of shipyard workers afflicted with asbestos-related disease. The First, Second, and Ninth Circuits have all held that admiralty jurisdiction does not extend to claims similar to those the plaintiffs assert here. The Fifth Circuit, in Lowe, supra, held that the complaint did not allege facts sufficient to support a claim of maritime jurisdiction, but the court concluded that because it was not "inconceivable that one or more plaintiffs would be able to establish admiralty jurisdiction by amended complaint," 723 F.2d at 1190, the cause should be remanded to give the plaintiffs an opportunity to amend. Although we do not agree fully with the analysis of any of our sister circuits, we find ourselves joining what appears to be the emerging majority view: Admiralty jurisdiction does not extend to damage claims such as these by land-based ship repair or construction workers for employment-related, asbestos-induced disease.
 
 B. The Location Test
 
 23
 Executive Jet did not replace, but rather supplemented, the traditional location requirement for maritime tort jurisdiction. In order for the federal maritime courts to exercise jurisdiction over a tort claim the tort still must occur at a maritime situs. Boudloche v. Conoco Oil Corp., 615 F.2d 687 (5th Cir.1980) (claim of plaintiff standing on shore when struck by a boat being removed from the water not within admiralty jurisdiction because situs requirement not met). Although the location test is not always easy to apply, e.g., Executive Jet, 409 U.S. at 266-67, 93 S.Ct. at 503-504, because of its longevity, its contours are reasonably well defined. Under the locality test, the tort occurs "where the alleged negligence took effect," rather than where the negligent act was done. Id. at 266, 93 S.Ct. at 504; The Plymouth, 70 U.S. (3 Wall.) at 34-35; In re Dearborn Marine Service, Inc., 499 F.2d 263, 274 (5th Cir.1974), cert. dismissed, 423 U.S. 886, 96 S.Ct. 163, 46 L.Ed.2d 118 (1975). Hence, a tort "occurs" at a maritime situs when a gun is fired from land into a boat on navigable waters, Kelly v. Smith, supra, and when components of a ship's navigational system are negligently manufactured on land but cause a collision on the high seas, Sperry Rand Corp. v. RCA, 618 F.2d 319 (5th Cir.1980). Although the negligent acts and omissions that the plaintiffs in this case allege occurred on land, for purposes of the jurisdictional test the tort occurred where the plaintiffs were exposed to the asbestos that caused their injuries. Also characteristic of the locality requirement is the extreme stringency with which the courts have applied it. See Boudloche, supra; compare T. Smith & Son, Inc. v. Taylor, 276 U.S. 179, 48 S.Ct. 228, 72 L.Ed. 520 (1928) (maritime law inapplicable to claim of longshoreman injured while standing on dock by ship's sling), with Minnie v. Port Huron Terminal Co., 295 U.S. 647, 55 S.Ct. 884, 79 L.Ed. 1631 (1935) (maritime law applicable to claim of longshoreman injured while standing on ship's deck by ship's hoist).[6]
 
 
 24
 This case presents the issue whether the situs test is met when an injury is the result of a number of exposures, only some of which occurred in a maritime situs, and where the effects of the various exposures are indivisible. As the Fifth Circuit noted in Borel, supra, asbestos-related disease is the cumulative result of all the patient's exposures to asbestos, "both past and recent," and it is "impossible, as a practical matter, to determine which exposure or exposures to asbestos dust caused the disease." 493 F.2d at 1083. Although most of the plaintiffs claim that the vast bulk of their exposures occurred aboard vessels docked in navigable waters, none appears to assert that he suffered no exposure on land. Other circuits facing this question have tended to hold, assume, or imply, without analysis, that workers suffering at least some exposures over navigable waters would meet the locality requirement. Keene Corp., 700 F.2d at 844; Owens-Illinois, 698 F.2d at 969; White II, 662 F.2d at 239. The appellants' contention, which the magistrate's report and recommendation supports to some degree,[7] is that the plaintiffs' claims fail to meet the situs requirement because the "wrong and injury complained of" was not "committed wholly upon the high seas or navigable waters." The Plymouth, 70 U.S. (3 Wall.) at 35 (emphasis added).
 
 
 25
 We agree with the Second, Fourth, and Ninth Circuits to the extent that they hold a plaintiff's claims have met the jurisdictional location requirement if the plaintiff has been exposed to asbestos on navigable waters regardless of whether he has also suffered exposures on land. As the Fifth Circuit determined in Borel, each exposure causes, or has the potential to cause, injury. Consequently, each exposure must be considered a "wrong" in Executive Jet terms. It is undisputed that the plaintiffs suffered exposures at a maritime situs; so if their claims met Executive Jet 's nexus test, they would be within the ambit of admiralty jurisdiction. It is true, of course, that claims arising from land-based exposures do not meet the situs test, and maritime law does not recognize them. It is also true, as the magistrate points out, that it would be difficult to separate the damage done on land from the injuries that resulted from maritime exposures. But that is a question of damages, not of jurisdiction; difficulty in calculating damages should not determine the jurisdictional issue. We conclude, therefore, that the plaintiffs have met the location test for at least that part of their claims that is the result of exposures that occurred on navigable waters.
 
 C. The Nexus Test
 
 26
 Nevertheless, we hold maritime jurisdiction inapplicable to the plaintiffs' claims because those claims do not "bear a significant relationship to traditional maritime activity." The Fifth Circuit, in the leading case of Kelly v. Smith, supra, set out four factors as relevant in analyzing the relationship a given claim bears to traditional maritime activity: "the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law." 485 F.2d at 525. In Kelly, the defendants had fired rifles from a private game preserve on an island in the Mississippi at the plaintiffs who were poachers fleeing across the river in a motorboat. The plaintiffs sought to invoke federal admiralty jurisdiction in their suit for damages. In deciding that admiralty law applied to the dispute, the Court relied primarily on the last of its four factors, stating that admiralty's preeminent interest in protecting navigation on major interstate waterways was strongly implicated. Id. at 526.
 
 
 27
 The five other Courts of Appeals that have faced this issue have demonstrated little agreement about those factors that are critical to the "nexus" analysis. In White II, supra, the Fourth Circuit held that admiralty did recognize claims of shipyard workers similar to those asserted by the plaintiffs here. That court focused on the "function of these shipyard workers," 662 F.2d at 239, and concluded that, because their efforts made it possible for vessels "to perform their maritime role as carriers of people and cargo," id., a sufficient nexus existed between the workers' claims and traditional maritime activity. But the court limited its holding to circumstances in which "the materials used by these shipyard workers were designed, advertised and marketed as maritime asbestos products." Id. at 240. In Owens-Illinois, supra, the Ninth Circuit focused on the distinction between new ship construction and ship repair. The court relied on cases deciding whether a contract dispute lies within admiralty jurisdiction. It pointed out that a contract for repair of a vessel is considered maritime, but a contract for construction of a vessel is not. 698 F.2d at 970. The court reasoned that, because the plaintiffs in that suit were involved in ship construction, their claims were outside the jurisdiction of admiralty courts. The Second Circuit in Keene Corp., supra, placed emphasis on both the construction/repair distinction and on the non-maritime nature of the offending product. Because the plaintiffs there were involved in ship construction and because the dangerous products were not designed for exclusive maritime use, the court held maritime jurisdiction inapplicable. In Austin, supra, the First Circuit preferred to focus on the nature of the decedent's job rather than on the type of project, vessel construction or repair, on which he worked. That court concluded that the plaintiff was entitled to invoke admiralty law only if her decedent was "injured while doing work traditionally done by members of the crew and thus, presumably, subject to many of the same hazards as seamen." 705 F.2d at 12. The court held that, because the decedent had been engaged in work "requiring special equipment and skills" not commonly found among the members of the ship's crew, admiralty law did not apply to the plaintiff's claims. Id. at 12-13. Although each of these courts has examined a factor or factors that we consider important to the proper analysis of the nexus requirement, we believe that exclusive focus on any single aspect of the plaintiffs' claims produces a mechanistic analysis not entirely consistent with the thrust of Executive Jet. We will examine all four of the Kelly v. Smith factors, placing special emphasis on the extent to which the plaintiffs' claims implicate the purposes of maritime jurisdiction.
 
 
 28
 The function and roles of the parties. Kelly suggests that the function and role of each of the parties is an important consideration, and exclusive attention to the type of employment in which the plaintiffs were engaged is therefore incorrect. In Sperry Rand Corp. v. RCA, 618 F.2d 319 (5th Cir.1980), the Fifth Circuit held that the fact that the defendant manufactured products on land that were not intended for exclusive maritime use was not dispositive of the jurisdictional question. The defendant was a manufacturer of defective electronic components that caused a ship's gyro-pilot steering system to fail, resulting in a vessel collision. The court held the case to be within the scope of admiralty jurisdiction. This holding does not imply that the non-maritime nature of the defendant's function is in all cases irrelevant; rather, Sperry stands for the proposition that this factor is not dispositive when the core purpose of maritime law, protection of vessels on navigable waters, is involved. But see Austin, 705 F.2d at 9-10 (appearing to hold, relying on Sperry, that the nature of the manufacturer and product is unimportant to jurisdictional analysis in maritime products liability cases). The defendants in this case are land-based manufacturers whose asbestos products, although important components in the construction and maintenance of vessels, were not designed specifically for maritime use. This fact militates against extension of admiralty jurisdiction to this dispute.
 
 
 29
 As our review of the cases above indicates, most other circuits considering the issue have focused almost exclusively on the role and function of the plaintiffs in determining whether their claims bear sufficient relationship to maritime activity. Those cases have, however, emphasized different aspects of the plaintiffs' employment in arriving at their conclusions. Here the plaintiffs' occupations were undeniably connected to maritime commerce; indeed, the plaintiffs' work is vital to the shipping industry. But importance to maritime commerce is not alone sufficient to bring an activity within the scope of admiralty jurisdiction. In Hollister v. Luke Construction Co., 517 F.2d 920, 921 (5th Cir.1975), the Fifth Circuit held that the nexus requirement was not met where a welder was injured while working on a floating but still incomplete hull, reasoning from maritime contract cases that ship construction is not a maritime activity. Were the importance of an activity to the flow of maritime commerce a dispositive consideration, the Hollister Court obviously would have had to hold otherwise. More germane is whether the activity itself is of a "maritime" nature. Courts have tended to describe contracts for ship repair as "maritime." E.g., Northern Pacific S.S. Co. v. Hall Brothers Marine Ry. & Shipbuilding Co., 249 U.S. 119, 128, 39 S.Ct. 221, 223, 63 L.Ed. 510 (1919). Nevertheless, in a tort case to label a pipefitter's occupation "maritime" on Monday because he is working on repairs to a completed vessel and to call identical work done on Tuesday "non-maritime" because he labors aboard an unfinished hull, is to retreat into the same sort of mechanical analysis dependent on fortuity that the Supreme Court condemned in Executive Jet. We agree with the First Circuit, Austin, 705 F.2d at 11-12, that the question properly asked is whether the actual tasks the workers perform bear any inherent relationship to maritime activity, that is, whether the plaintiffs' jobs are identical to those undertaken by land-based workers and are connected to maritime affairs merely because performed aboard ship, or whether they are tasks somehow unique to maritime service or work traditionally done by seamen. See United N.Y. & N.J. Sandy Hook Pilots Ass'n. v. Halecki, 358 U.S. 613, 617-18, 79 S.Ct. 517, 519, 3 L.Ed.2d 541 (1959); Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 61-62, 34 S.Ct. 733, 735, 58 L.Ed. 1208 (1914); Waganer v. Sea-Land Service, Inc., 486 F.2d 955, 959 (5th Cir.1973) (asking whether the plaintiffs were "engaged in a specialized task demanding training and skills not customarily found among seamen").[8] The plaintiffs here were engaged in trades, such as pipefitting, welding, and insulating, linked more with the land than with the sea. Their skills and training are those of landsmen, not of sailors. The plaintiffs' "role and function", although related to maritime commerce, do not call for the application of admiralty jurisdiction.
 
 
 30
 The types of vehicles and instrumentalities involved. As in Kelly, "the vehicle involved was a boat, not an automobile or airplane, whose function was transportation across navigable waters, a traditional role of watercraft," 485 F.2d at 526; the plaintiffs argue that because they worked aboard ships, their claims are within the scope of admiralty jurisdiction. But here, although vessels are "involved," their involvement is at most tangential and has no effect on the character of the plaintiffs' claims. Nothing about the underlying claims would be different if the plaintiffs had been employed constructing or repairing buildings on land. Consequently, the "involvement" of vessels in this case is not strong support for the application of admiralty law.
 
 
 31
 The other instrumentality involved, asbestos insulation, like iron or the electronic devices in Sperry, is used in the construction and repair of ships but has no uniquely maritime character. As we concluded above, this fact is not dispositive, but it does suggest that the dispute may not be within admiralty jurisdiction.
 
 
 32
 The causation and type of injury. The non-maritime nature of the plaintiffs' injuries, injuries that now afflict thousands of land-based workers as well, militates strongly against application of maritime jurisdiction. Like the gunshot wounds in Kelly, the plaintiffs' maladies may not be "so inherently indigenous to land as to preclude any maritime connection," 485 F.2d at 526 (emphasis supplied), but they do constitute yet another factor to be weighed against application of maritime law.
 
 
 33
 Traditional concepts of the role of admiralty law. Of the four factors set out in Kelly, this is clearly the most important. The Kelly Court itself relied heavily on the policies of maritime jurisdiction in deciding to apply the law of admiralty. Id. More recently, the Supreme Court in Foremost Insurance Co. v. Richardson, 457 U.S. 668, 674-77, 102 S.Ct. 2654, 2658-2660, 73 L.Ed.2d 300 (1982), focused almost exclusively on the purposes of maritime law when it decided that a significant relationship to commercial maritime activity is not necessary for application of maritime jurisdiction. The Constitution's framers and Congress endowed the federal courts with jurisdiction over maritime disputes in order to advance specific federal interests; application of uniform federal maritime law is unjustified where those interests are not implicated. As two eminent commentators have asserted, "[w]hether a given inclusion within or exclusion from the jurisdiction is warranted must depend on the general sense and policy of having the jurisdiction at all." G. Gilmore & C. Black, The Law of Admiralty, 30 (2d ed. 1975).
 
 
 34
 Admiralty's purposes are various but limited. In Executive Jet the Supreme Court described admiralty as dealing with navigational rules, apportionment of liability for maritime disasters, protection of seamen aboard ship, and establishment of uniform rules for maritime liens, captures of prizes, liability for cargo damage, and claims for salvage. 409 U.S. at 269-70, 93 S.Ct. at 505. The Court has also stated that "the primary focus of admiralty jurisdiction is unquestionably the protection of maritime commerce." Foremost Insurance, 457 U.S. at 674, 102 S.Ct. at 2658. Our precedent indicates that "[a]dmiralty jurisdiction in the federal courts was predicated upon the need for a uniform development of the law governing the maritime industries." Peytavin v. Government Employees Insurance Co., 453 F.2d 1121, 1127 (5th Cir.1972). Disputes not involving these interests are not within the admiralty jurisdiction of the federal courts.
 
 
 35
 Admiralty law is not concerned with claims such as those of the plaintiffs. We can foresee no way in which a result in this case in favor of either the land-based shipyard workers or the asbestos manufacturing defendants will have any more than the most attenuated impact on maritime commerce. None of the issues that the Supreme Court listed in Executive Jet are involved. Rather, the issues that this litigation presents are identical to those presented in countless other asbestos suits; they involve questions of tort law traditionally committed to local resolution. Absent congressional action, the federal interest in these claims is insufficient to justify federal courts supplanting state law with the federal common law of admiralty. See Executive Jet, 409 U.S. at 272-73, 93 S.Ct. at 506-507 (quoted supra ). "In the situation before us, which is only fortuitously and incidentally connected to navigable waters ... the [state] courts could plainly exercise jurisdiction over the suit, and could plainly apply familiar concepts of [state] tort law without any effect on maritime endeavors." Id. at 273, 93 S.Ct. at 507 (footnotes omitted).
 
 
 36
 The plaintiffs have suggested several federal interests that they believe justify application of maritime laws. The first is uniformity. Although uniformity of the law governing maritime matters is an important purpose of federal admiralty jurisdiction, Peytavin, supra, that policy is not implicated by claims that bear no relationship to maritime matters. As we have suggested, this is such a case. The federal government may or may not have an interest in maintaining uniform rules for resolving asbestos injury claims, but such an interest would be for Congress, not this Court, to articulate. Moreover, if the federal government had such an interest, we would hardly advance it by applying federal substantive law in the small percentage of asbestos cases involving shipyard workers; "for this Court to uphold federal admiralty jurisdiction in a few wholly fortuitous [asbestos] cases would be a most quixotic way of approaching that goal." Executive Jet, 409 U.S. at 273-74, 93 S.Ct. at 507. Secondly, the plaintiffs point out that if we apply Alabama law to their claims the state statute of limitations will deny some of them relief. They ask us to apply admiralty law in the interests of justice. The district court has not yet faced the limitations issue, and we do not wish to influence its inevitable resolution of that question. Nevertheless, we can say that it is possible that the claims of some plaintiffs may be precluded by operation of the state statute of limitations, which could have run out before some plaintiffs were even aware that they were sick. See note 1, supra. If the plaintiffs are otherwise deserving claimants, this result appears to us unjust, but this potential injustice does not mandate this Court to assert its admiralty jurisdiction. By granting the federal courts jurisdiction over maritime disputes, the Constitution does not license them to repair injustice wherever they may perceive it. The purpose of admiralty jurisdiction is not to permit the federal courts to recognize causes of action for claims they believe meritorious whenever state law precludes such claims. Whether or not we agree, we are bound to respect Alabama's policy, expressed in its statute and constitution, of granting repose to potential tort defendants a year after commission of the wrong. We can discern no federal policy requiring this Court to apply to the plaintiffs a different set of substantive rules than those applied in countless other asbestos cases merely because the plaintiffs worked on ships rather than on land.
 
 
 37
 Our review of the four Kelly v. Smith factors indicates that there is little support for the application of maritime jurisdiction to the plaintiffs' claims. On the other hand, a number of factors, including the function and role of the defendants, the injuring instrumentality, the nature of the injury, and most importantly the relationship between the claims and the traditional purposes of admiralty law, militate strongly in favor of the conclusion that admiralty jurisdiction does not recognize the plaintiffs' claims. Accordingly, we hold that this case is outside the maritime jurisdiction of the federal courts.[9]
 
 V. CONCLUSION
 
 38
 Because the plaintiffs' claims are not cognizable under federal maritime jurisdiction, there is no justification for supplanting state tort law with the substantive law of admiralty. Consequently, although we do not agree with its analysis, we hold that the district court's conclusion that the law of the State of Alabama applies to this case is correct. Also correct are the district court's dismissals of the plaintiffs' claims based on the law of admiralty and of those third-party claims that were based on contribution theories. For the foregoing reasons we AFFIRM the judgments of the district court.
 
 
 
 [1]
 The plaintiffs seek to apply federal maritime law in order to avoid the Alabama statute of limitations, which may preclude some plaintiffs' claims. Sections 6-2-30 and 6-2-39 of the Code of Alabama require plaintiffs to commence tort actions within one year "after the cause of action has accrued." Ala.Code Sec. 6-2-30(a). The Alabama Supreme Court has held that a cause of action based on exposure to a "latent, insidious agent" accrues, and "the statute of limitations of one year [begins] to run when plaintiff was last exposed ... and plaintiff's ignorance of the tort or injury, there being no fraudulent concealment, does not postpone the running of the statute until the tort or injury is discovered." Tyson v. Johns-Manville Sales Corp., 399 So.2d 263, 268 (Ala.1981), quoting Garrett v. Raytheon, 368 So.2d 516, 521 (Ala.1979). In 1980 the Alabama legislature amended Section 6-2-30 by providing that actions for injury "resulting from exposure to asbestos, including asbestos-containing products, shall be deemed to accrue on the first date the injured party, through reasonable diligence, should have reason to discover the injury giving rise to such a civil action." Ala.Code Sec. 6-2-30(b). The amendment provided further that the new definition of accrual would apply retroactively "to all pending causes of action." 1980 Ala.Acts, No. 80-566, Sec. 3. The Alabama Supreme Court held this retroactivity provision invalid under Section 95 of the Alabama Constitution which provides that "the legislature shall have no power to revive any right or remedy which may have become barred by lapse of time, or by any statute of this state." Tyson, 399 So.2d at 268-70
 
 
 [2]
 In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), theEleventh Circuit adopted the case law of the former Fifth Circuit handed down as of September 30, 1981, which is binding unless and until overruled or modified by this Court en banc
 
 
 [3]
 Another issue we need not reach: Defendant Johns-Manville Corp. has filed for bankruptcy under Chapter 11 of the Revised Bankruptcy Act, 11 U.S.C.A. Sec. 101 et seq., and obtained a restraining order barring further judicial proceedings against it. In re Johns-Manville Corp., 26 B.R. 405 (Bkrtcy.S.D.N.Y.1983); 11 U.S.C.A. Sec. 362(a)(1). The other defendants argue that, because Johns-Manville is central to the litigation, this Court should stay further proceedings in this case pending the lifting of the restraining order. We have disposed of their motion to that effect by order dated March 7, 1984, in which we denied the motion without prejudice. At the same time, we granted a motion for severance of Johns-Manville and defendant Amatex Corp., which has also filed for bankruptcy under Chapter 11
 
 
 [4]
 The courts have applied different jurisdictional tests to contract disputes, generally focussing on the subject matter of the contract. As the Supreme Court summarized in Grant Smith-Porter Co. v. Rohde, 257 U.S. 469, 477, 42 S.Ct. 157, 158, 66 L.Ed. 321 (1922), "in contract matters admiralty jurisdiction depends upon the nature of the transaction and in tort matters upon the locality."
 
 
 [5]
 There are some exceptions to the requirement that torts must have occurred on navigable waters to be cognizable by maritime law. Maritime law has traditionally afforded a seaman a remedy for injuries suffered in the course of service to his vessel that occur on land. Executive Jet, 409 U.S. at 259-60, 93 S.Ct. at 500 (1972). In 1948 Congress enacted the Extension of Admiralty Act, 46 U.S.C.A. Sec. 740, which expanded admiralty jurisdiction to cover claims for injury or damage done to persons or structures on land by ships on navigable waters. See note 6, infra
 
 
 [6]
 Congress overruled this distinction when it enacted the Admiralty Extension Act. 46 U.S.C.A. Sec. 740. That section extends admiralty jurisdiction to cover claims for on-shore injuries caused by a vessel on navigable waters. Because the land-based exposures the plaintiffs suffered in this case occurred on vessels that were in dry-dock and outside navigable waters, the Admiralty Extension Act does not apply maritime jurisdiction to claims resulting from the plaintiffs' land-based exposures. Boudloche, supra
 
 
 [7]
 The magistrate's report can be read to rely on the mixed-situs problem as a rationale only for invoking the "maritime and local" doctrine to apply state law. Because we decide that admiralty jurisdiction does not apply to these claims, we need not delve into the complexities of the maritime and local doctrine
 
 
 [8]
 Both the appellees and the First Circuit rely heavily on cases involving the scope of the remedy for unseaworthiness, such as Halecki and West v. United States, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959), for the proposition that repair work is not maritime if the repaired vessel has been taken out of navigation. These cases hold that shipowners owe no duty of seaworthiness to repair workers on an out-of-navigation vessel. The principle underlying this proposition in the seaworthiness context--that a shipowner should not remain responsible for conditions aboard a ship, control of which the shipowner has turned over to a shipyard for repairs--is not directly applicable in determining the scope of maritime jurisdiction
 
 
 [9]
 The plaintiffs contend that Section 5(b) of the Longshoremen's and Harbor Workers' Compensation Act extends maritime jurisdiction to their claims. That section provides in part:
 In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages ....
 33 U.S.C.A. Sec. 905(b). The plaintiffs contend in their brief that "it can accurately be asserted that each of these Plaintiffs' law suits arises out of the LHWCA and pursuant to Section 905(b) their third party law suits must be governed by the substantive law of admiralty." The contention is faulty for at least two reasons. First, and most obviously, Section 5(b) applies only to suits against vessels. Because the plaintiffs are asserting their claims against third parties other than vessels, the section is not relevant. See Austin, 705 F.2d at 13. Second, this Court's precedent has consistently held that in enacting Section 5(b) "Congress did not intend ... to create a new or broader cause of action in admiralty." Parker v. South Louisiana Contractors, Inc., 537 F.2d 113, 117 (5th Cir.1976), cert. denied, 430 U.S. 906, 97 S.Ct. 1175, 51 L.Ed.2d 582 (1977); see also Bynum v. Patterson Truck Lines, Inc., 655 F.2d 643, 644 n. 1 (5th Cir. Unit A 1981). The basic holding of these cases is that Section 5(b), rather than creating a new cause of action, merely preserves certain preexisting remedies to injured workers against third parties. See Russell v. Atlantic & Gulf Stevedores, 625 F.2d 71, 72 (5th Cir.1980).
 While on the subject of the LHWCA, we should point out that this litigation is not the only source of compensation available to the plaintiffs. Each of the plaintiffs has claimed benefits under the LHWCA.