Robert E. PENTON, Sr.,
Plaintiff–Appellee,

v.

POMPANO CONSTRUCTION CO., INC., and Futch Leasing, Inc., Defendants,

Futch Construction, Inc., Defendant–Appellant.

Robert E. PENTON, Sr., Plaintiff–Appellee,

v.

POMPANO CONSTRUCTION COMPANY, INC., Defendant,

Futch Construction, Inc., Futch Leasing, Inc., Defendants–Appellants.

Nos. 90–5469, 92–4622.

United States Court of Appeals, Eleventh Circuit.

Nov. 2, 1992.

Rehearing and Rehearing En Banc Denied Jan. 5, 1993.

---

Gail Leverett, Kubicki, Draper, Gallagher & McGrane, P.A., Miami, Fla., for defendants-appellants.

Darryl J. Tschirn, Metairie, La., for plaintiff-appellee.

Before TJOFLAT, Chief Judge, EDMONDSON, Circuit Judge, and DYER, Senior Circuit Judge.

TJOFLAT, Chief Judge:

The principal issue presented by this appeal is whether appellee's negligence claim for personal injury in the construction of a jetty on Key Biscayne, Florida, alleged a maritime tort. The district court held that it did and, in accordance with the jury's verdict, entered judgment awarding appellee $210,000 in damages. Because the negligence alleged in this case had insufficient nexus to the traditional concerns of maritime law, we hold that appellee's claim did not present a maritime tort. Accordingly, we reverse the district court's judgment and instruct the court to enter judgment for the appellant.

## I.

## A.

In January 1987, appellant Futch Construction, Inc. (Futch) contracted with the United States Corps of Engineers to construct a 150–foot–long jetty out into the Atlantic Ocean at the southeast end of Key Biscayne, Florida, near the Cape Florida Lighthouse. Futch, in turn, subcontracted with Pompano Construction Company, Inc. (Pompano) to do the actual construction work; Futch and its wholly-owned subsidiary, Futch Leasing, Inc. (Futch Leasing), provided the rocks and other building materials for the jetty, and supplied and maintained the heavy equipment used at the job site.

Pompano hired appellee Robert Penton, Sr. (Penton) to operate the crane used in offloading the rocks from the supply barges and in the placement of the rocks to form the jetty. The crane was mounted on one of Pompano's barges that was towed daily one and a half miles from shore to the job site and "spudded" down. On August 4, 1987, the jetty was finished and there was no further need for the crane. Penton and a co-worker, who operated Futch's land-based backhoe, were assigned the task of moving the crane from the barge on which it was mounted onto the land where it could be loaded on a truck and taken away. Penton was injured as he was carrying out this task. As Penton was standing on the crane's "clam bucket"—in the process of unloading the clam bucket from the deck of the barge onto the land—the co-worker extended the arm of the backhoe and crushed Penton's leg between the clam bucket and the scoop of the backhoe.

## B.

On July 18, 1988, Penton initiated this action against Pompano, Futch, and Futch Leasing claiming that their negligence caused his injury.[1] Penton sought compensation for this negligence under the maritime law because, he alleged, his injury occurred while he was engaged in maritime activity. In order to obtain a jury trial, Penton invoked the district court's diversity of citizenship jurisdiction, 28 U.S.C. § 1332 (1988), and brought his action on the "law side" of the court rather than in admiralty.[2]

Pompano chose not to respond to Penton's complaint, and Penton took a default. See Fed.R.Civ.P. 55(a) (1988). Futch and Futch Leasing, however, answered Penton's complaint. First, they denied that they were negligent and caused Penton's injury. Then, pleading alternatively, they alleged that their negligence, if any, constituted a common law tort, rather than a maritime tort, the recovery for which was barred by Florida's Workers' Compensation Law, Fla.Stat. § 440.11(1) (1987).[3]

---

**1.** Penton also claimed that the unseaworthiness of the materials barge (on which the crane was mounted) caused his injuries. Penton did not pursue this claim, and, therefore, it is not before us.

**2.** As a general rule, maritime claims brought in admiralty are not triable to a jury. See Fed. R.Civ.P. 38(e) (1988); William P. Brooks Constr. Co. v. Guthrie, 614 F.2d 509, 511 (5th Cir.1980); 7A James W. Moore et al., Moore's Federal Practice ¶ .59[3] (1988); 9 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2315 (1971). Maritime claims not brought in admiralty, however, are triable to a jury. See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 360, 82 S.Ct. 780, 784, 7 L.Ed.2d 798 (1962).

**3.** Pompano, as required by its contract with Futch, had covered Penton with workers' compensation insurance in accordance with Florida's Workers' Compensation Law, Fla.Stat.

§§ 440.01–440.60 (1987). Fla.Stat. § 440.10(1) provides in pertinent part:

(1) Every employer coming within the provisions of this chapter, [such as Pompano,] ... shall be liable for, and shall secure, the payment to his employees, ... of the compensation payable under ss. 440.13 [medical services and supplies], 440.15 [compensation for disability], and 440.16 [compensation for death].

Fla.Stat. § 440.10(1) (1987). Following the accident, Penton applied for and received workers' compensation benefits from Pompano's insurer. Penton's remedy against Pompano—and Futch and Futch Leasing, as well—under Florida tort law for the injuries he had sustained was exclusively that provided by the state's workers' compensation statute. Fla.Stat. § 440.11(1) provides in pertinent part:

The liability of an employer prescribed in s. 440.10 shall be exclusive and in place of all other liability of such employer to any third-

The case proceeded to trial against Futch and Futch Leasing[4] without resolving whether Penton had alleged a maritime tort claim immune from the preclusive effect of Florida's Workers' Compensation Law. In fact, it was not until the close of Penton's case in chief, when Futch and Futch Leasing each moved for a directed verdict, that the court addressed the question. After hearing argument from counsel, the court held that the circumstances that produced Penton's injury had sufficient nexus with traditional maritime activity to render his claim cognizable as a maritime claim, concluded that Florida's Workers' Compensation Law did not bar recovery, and denied their motions. The court adhered to this holding when, at the close of all the evidence, the defendants once again moved for directed verdicts. At this point, however, the court observed that Futch Leasing, in simply furnishing the backhoe, had done nothing that could be deemed negligent; accordingly, it dismissed Futch Leasing from the case.

The court submitted the case against Futch to the jury under a typical negligence instruction.[5] The jury found Futch negligent and awarded Penton $210,000 in damages. Futch then moved for judgment notwithstanding the verdict. The court denied this motion, and Futch appealed.

At the time Futch took his appeal, the district court had not yet disposed of Penton's claim against Pompano (the damages issue had not been decided), or entered a Fed.R.Civ.P. 54(b) (1988) judgment against Futch; accordingly, we lacked jurisdiction to entertain Futch's appeal. Instead of dismissing it, however, we stayed our hand to permit the entry of a Rule 54(b) judgment and a new appeal. *Penton v. Pompano Constr. Co.*, 963 F.2d 321 (11th Cir. 1992) (per curiam). A Rule 54(b) judgment has now been entered, and Futch has lodged a new appeal. We therefore dismiss the initial appeal, and proceed to dispose of the instant appeal.

## II.

### A.

◼ The principal issue presented is whether Penton's negligence claim constitutes a maritime tort.[6] To resolve this issue, we make factual inquiry, taking into account both the situs of the injury and the "significant relationship" between the alleged wrong and "traditional maritime activity." *Executive Jet Aviation, Inc. v. City of Cleveland*, 409 U.S. 249, 268, 93 S.Ct. 493, 504, 34 L.Ed.2d 454 (1972).[7] In

party tortfeasor and to the employee, the legal representative thereof, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death....
Fla.Stat. § 440.11(1) (1987).
Because section 440.11(1) foreclosed whatever common law tort claims Penton had against Pompano, Futch, and Futch Leasing, Penton did not, in his complaint, present a common law tort claim against them; rather, he sued them under the maritime law which, he contended, would not give effect to the preclusive provision of Florida's workers' compensation statute, section 440.11(1). We need not address this further preemption issue, however, because we find that Penton does not present a maritime claim, *see infra* part II B. *But cf. Brockington v. Certified Elec., Inc.*, 903 F.2d 1523, 1529–33 (11th Cir.1990) (maritime claim's remedies are barred under Georgia's Workers' Compensation Act).

4. Penton had obtained a default against Pompano, as noted in the text, and had been instructed by the district court to submit affidavits in proof of his damages. Given that the court planned to resolve the damages issue against Pompano in this fashion, there was no need for Pompano to appear at the trial.

5. The court lifted its instruction on negligence from the pattern jury instructions used by Florida's trial courts.

6. In resolving this issue, we in essence determine whether Penton's claim falls within the admiralty jurisdiction of the federal courts. *Harville v. Johns–Manville Prods. Corp.*, 731 F.2d 775, 779 (11th Cir.1984).

7. Prior to 1972, the determination of whether a tort was maritime depended solely upon the situs of the wrong. A "maritime tort" was a tort "committed wholly upon the high seas or navigable waters, or, at least, the substance and consummation of the same [took] place upon these waters." *The Plymouth*, 70 U.S. (3 Wall.) 20, 35, 18 L.Ed. 125 (1866). In 1972, the Supreme Court in *Executive Jet*, which arose out of an aircraft accident over navigable water, rejected this strict situs test stating:
    [i]t is far more consistent with the history and purpose of admiralty to require also that the

this case, neither party contests the fact that the situs of the accident was on navigable water. What we must decide, therefore, is whether Penton's claim has a sufficient connection to traditional maritime activity to constitute a maritime tort.

### B.

■ Over the past two decades, the Supreme Court has refined, in a trilogy of cases starting with *Executive Jet*, extending through *Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), and ending with *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), the test for determining whether a claim bears a sufficient connection to traditional maritime activity. Under the current test, outlined in *Sisson*, a claim is cognizable as a maritime claim if the activity from which the incident arose [8] (1) has a substantial relationship to a traditional maritime activity, *Sisson*, 497 U.S. at 364–65, 110 S.Ct. at 2897,[9] and (2) has a "potentially disruptive impact on maritime commerce," *id.* at 364, 110 S.Ct.

at 2896; *see Foremost Ins.*, 457 U.S. at 675, 102 S.Ct. at 2658.[10]

■ For our present purposes, we first address whether the activity that caused Penton's accident bears a substantial relationship to traditional maritime activity. Because we find the activity is not substantially related to traditional maritime activity, Penton's claim is not cognizable as a maritime claim.

The activity that caused Penton's injury was the moving of the crane's clam bucket from the deck of the barge onto the land where it could be loaded on a truck and taken away. With the completion of the crane's construction of the jetty, the parties simply were removing heavy equipment that was no longer required at the job site; and, in the process of removing this heavy equipment, Penton sustained his injury. This portrayal of the incident characterizes it as a typical construction site accident caused by the allegedly improper maintenance of a piece of the construction equipment, the backhoe. Clearly, there is

---

wrong bear a significant relationship to traditional maritime activity. We hold that unless such a relationship exists, claims arising from airplane accidents are not cognizable in admiralty in the absence of legislation to the contrary.
*Executive Jet*, 409 U.S. at 268, 93 S.Ct. at 504. Shortly after *Executive Jet*, the Fifth Circuit held this new "significant relationship," or nexus, requirement applicable in all cases claiming to be maritime torts. *Kelly v. Smith*, 485 F.2d 520, 524 (5th Cir.1973), *cert. denied*, 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974). The Supreme Court approved this application in *Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 674, 102 S.Ct. 2654, 2658, 73 L.Ed.2d 300 (1982).

**8.** We recognize, as did the Court in *Sisson*, that if more than one activity causes the incident in question, the analysis subsequently described in the text must begin, first, with the identification of the activity that predominately caused the incident. *See Sisson*, 497 U.S. at 365–66 & nn. 3 & 4, 110 S.Ct. at 2897–98 & nn. 3 & 4.

**9.** This requirement of maritime claims was first announced in *Executive Jet, see supra* note 7. There the Court held that admiralty jurisdiction did not lie in an action arising from an airplane crash into navigable waters when the plane flew into a flock of seagulls over Cleveland's airport, because the incident did not "bear a significant relationship to traditional maritime activity."

409 U.S. at 268, 93 S.Ct. at 504. The Court then proceeded to define "traditional maritime activity" to mean the "problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go." *Id.* at 269–70, 93 S.Ct. at 505. Eighteen years later, the Court in *Sisson* effectively adopted *Executive Jet*'s definition of traditional maritime activity, noting that traditional maritime activity "extends at least to any other activities traditionally undertaken by vessels, commercial or noncommercial." *Sisson*, 497 U.S. at 365, 110 S.Ct. at 2898.

**10.** In *Foremost Insurance*, the Court held that the activity giving rise to a maritime claim need not be a commercial maritime activity or an activity bearing a substantial relationship to a commercial activity so long as it has a "potential[ly] disruptive impact" on maritime commerce. 457 U.S. at 674–75, 102 S.Ct. at 2658. The Court held, therefore, that the improper navigation that led to the collision of the two pleasure boats in that case was cognizable in admiralty because it could possibly disrupt maritime commerce. *Id.* Eight years later in *Sisson*, the Court concluded that a marina fire started on a pleasure boat was "likely to disrupt [maritime] commercial activity" because it could "spread to nearby commercial vessels or make the marina inaccessible to such vessels." *Sisson*, 497 U.S. at 362, 110 S.Ct. at 2896.

nothing about these features of the case that possess a uniquely maritime flavor.

Placing the incident under such sharp focus, however, does not afford a large enough perspective from which to determine whether the activity causing the incident either is a maritime activity or bears a substantial relationship to other activities traditionally undertaken by vessels. Obviously, the barge's involvement in the incident, which is the main feature missing from the above portrayal, counsels caution. Moreover, as a general rule, the involvement of a vessel in a case strongly disposes a court to apply admiralty law.[11] We must determine whether the presence of the barge in this case cast the activity of moving the crane's clam bucket in a maritime light and, as Penton suggests, transformed the activity that caused Penton's injury from a typical construction site accident into the "offloading of a vessel."

■■■ Admittedly, the crane barge in this case is a vessel. *See Broughton Offshore Drilling, Inc. v. South Cent. Mach., Inc.*, 911 F.2d 1050, 1053 (5th Cir.1990) (injury to drilling barge's buoyancy mat is damage to a "vessel"). It was towed daily over the navigable waters off the coast of Key Biscayne. The mere presence of a vessel in a case, however, is not enough to establish the required nexus between the alleged wrong and traditional maritime activity. That nexus, for instance, is established if the activity in question damages the vessel while it is engaged in maritime activity, *see East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864, 106 S.Ct. 2295, 2298, 90 L.Ed.2d 865 (1986) (where tort caused damage to vessel the maritime nexus requirement "clearly was met"), or the unseaworthy condition of the vessel is an integral part of the activity causing the plaintiff's injury, *see Taylor v. Kennedy Engine, Inc.*, 861 F.2d 127, 129–30 (5th Cir.1988) (crew member is injured as result of land-based crane's damage to

vessel's ladder), or the activity in question is substantially similar to a traditional activity undertaken by a vessel, *see Sisson*, 497 U.S. at 365, 110 S.Ct. at 2898. Here, there is no question of any damage to the barge, and, clearly, the barge's condition had nothing to do with Penton's accident. Thus "[n]othing about the underlying claim[ ] would be different if the plaintiff [ ] had been employed constructing ... on land." *Harville v. Johns–Manville Prods. Corp.*, 731 F.2d 775, 785 (11th Cir.1984). What remains to be determined, therefore, is whether the unloading of the crane's clam bucket is substantially similar to the traditional maritime activity of offloading a vessel. We find that it is not.

To characterize the unloading of the clam bucket in this case as the offloading of a vessel would be to imply that the crane and its bucket were the barge's cargo, that Futch's backhoe was placed on the job to load and unload the barge's cargo, and that Penton was hired by Pompano to serve as the barge's stevedore or crew member. Such a characterization completely misses the mark. Penton is a construction worker by training and experience; his "skills and training are those of landsmen, not of sailors." *Harville*, 731 F.2d at 785. Futch's backhoe was not placed on the job to "service" the barge; rather, until the day of the accident, it was used to move rocks in the construction of the jetty. Finally, the barge served as a platform, albeit a floating platform, for the crane's water-side construction of the jetty—the crane was not in any meaningful sense the barge's "cargo."

In *Peytavin v. Government Employees Insurance Co.*, 453 F.2d 1121, 1126–27 (5th Cir.1972),[12] we concluded that a defendant's conduct did not amount to a maritime tort just because it took place upon a floating pontoon. The incident in *Peytavin* was a rear-end automobile collision on a pontoon used for loading and unloading a ferry that

---

11. *See, e.g., Sisson*, 497 U.S. at 374, 110 S.Ct. at 2902 (Scalia, J., dissenting) ("It would be more straightforward to jettison the 'traditional maritime activity' analysis entirely, and to return (for vessels) to the simple locality test").

12. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

resulted in a neck and back injury to the plaintiff. *Id.* at 1122. In *Kelly v. Smith,* we cited *Peytavin* for the proposition that "we must look to *all* the circumstances for a substantial maritime relationship." 485 F.2d 520, 525 (5th Cir.1973), *cert. denied,* 416 U.S. 969, 94 S.Ct. 1991, 40 L.Ed.2d 558 (1974) (emphasis added). We recalled *Peytavin* with these words: "Finding that a rear-end collision between terrestrial vehicles, operated by landlubbers, and resulting in a typical automobile traffic accident injury lacked sufficient maritime flavor, we concluded [in *Peytavin* ] that admiralty jurisdiction was absent." *Id.* Similarly, we find today that what is effectively a construction site accident—caused by a land-based backhoe operated by landlubbers, and resulting in a typical construction site injury—lacks "sufficient maritime flavor" to support Penton's characterization of this incident as the offloading of a vessel.

As previously stated in our discussion of *Sisson,* because the activity that caused the incident in this case does not bear a substantial relationship to a traditional maritime activity, our inquiry is at an end; Penton's claim is not a maritime tort. We need not consider, therefore, the second prong of the *Sisson* test: whether the activity giving rise to Penton's claim had a "potentially disruptive impact on maritime commerce." 497 U.S. at 364, 110 S.Ct. at 2896.

In sum, even though Penton's accident occurred on a vessel, satisfying the situs requirement for the district court's application of admiralty law to Penton's negligence claim, the activity causing Penton's injury was, in fact, non-maritime; the incident did not bear a substantial relationship to traditional maritime activity. Without such a nexus between the alleged wrong and traditional maritime activity, Penton's claim cannot constitute a maritime tort and, consequently, it is not immune from the preclusive effect of Florida's workers' compensation statute, section 440.11(1).

### III.

For the foregoing reasons, and in accordance with our prior opinion in *Penton v.* *Pompano Construction Co.,* 963 F.2d 321, 322 (11th Cir.1992), we consolidate Nos. 90–5469 and 92–4622, DISMISS No. 90–5469, and as to No. 92–4622, REVERSE the district court's judgment and REMAND with the instruction to enter judgment in favor of the appellant.

IT IS SO ORDERED.