Lois Jean CONNER, et al., Plaintiffs,

v.

ALFA LAVAL, INC., et al., Defendants.

James H. Prange, et al., Plaintiffs,

v.

Alfa Laval, Inc., et al., Defendants.

James W. Stone, et al., Plaintiffs,

v.

Alfa Laval, Inc., et al., Defendants.

Tina M. Willis, Plaintiff,

v.

BW IP International, Inc., et al., Defendants.

MDL No. 875.
Civil Action Nos. 09–67099, 09–91848, 09–93726–File, 09–91449.
Transferred from the Central District of California Case Nos. 09–02317, 09–06698.
Transferred from the Northern District of California Case No. 09–02327.
Transferred from the District of South Carolina Case No. 09–02163.

United States District Court, E.D. Pennsylvania.

July 22, 2011.

David Bricker, Michael L. Armitage, Michael B. Gurien, Cindy Jean Young, Waters Kraus & Paul, El Segundo, CA, Duncan Lemmon, Connor & Bishop, San Francisco, CA, Francis C. Schenck, Law Office of F.C. Schenck, Atlanta, GA, Banafsheh E. Saifollahi, Jacqueline G. Badders, Waters & Kraus LLP, Baltimore, MD, Charles S. Siegel, Waters & Kraus LLP, Dallas, TX, for Plaintiff.

Peter A. Santos, Nexsen Pruet PLLC, Charlotte, NC, Carla Lynn Crochet, Prindle Decker Amaro, Long Beach, CA, Sonja E. Blomquist, Vernice T. Louie, Low, Ball & Lynch, Thomas J. Moses, Brydon Hugo & Parker, Charles S. Bishop, Michael Karatov, Connor & Bishop, Robert L. Nelder, Robert M. Hamblett, Hassard Bonnington, San Francisco, CA, Dennis M. Young, Foley & Mansfield PLLP, Oakland, CA, J. Scott Wood, Foley & Mansfield, Seattle, WA, John C. McMeekin, Rawle & Henderson, Cy Goldberg, Jason Wayne Rubin, Goldberg, Miller & Rubin, PC, John A. Turlik, Segal McCambridge Singer & Mahoney, Dennis J. Valenza, Morgan, Lewis & Bockius LLP, Philadelphia, PA, Kevin Douglas Jamison, David G. Larmore, Sandra L. Gryder, Timothy C. Pieper, Pond North LLP, Craig R. Maki, Karen L. Finateri Silbiger, Selman Breitman LLP, Corinne Deveza Orquiola, Elan N. Stone, John A. Graniez, Paul A. Johnson, Lewis Brisbois Bisgaard Smith LLP, Paul Christopher White, II, Dehay & Elliston LLP, Edward Richard Ulloa, Julia A. Gowin, Robert E. Thackston, Hawkins, Parnell Thackston & Young LLP, Patricia Daffodil Tyminski, Tricia A. Takagi, Morgan Lewis & Bockius LLP, Los Angeles, CA, Michael J. Zukowski, K&L Gates, Pittsburgh, PA, Dennis E. Vega, Sedgwick Detert Moran & Arnold, Newark, NJ, Henry David Rome, Howard Rome Marin Ridley LLP, Redwood City, CA, Constance Fraenkel, Becherer Kannett Schweitzer, Emeryville, CA, Edward M. Slaughter, Hawkins Parnell & Thackston, Dallas, TX, for Defendants.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

I. INTRODUCTION ................................................ 458

II. BACKGROUND ................................................ 459
 A. *Conner v. Alfa Laval, Inc.* ................................ 459
 B. *Prange v. Alfa Laval, Inc.* ................................ 459
 C. *Stone v. Alfa Laval, Inc.* ................................ 460
 D. *Willis v. BW IP International, Inc.* ........................ 460

III. DISCUSSION ................................................ 460
 A. Legal Standard for Determining Whether Maritime Law Applies ............ 461
 1. Historical Development ................................ 461
 2. Modern Standard ................................ 462
 B. Caselaw Treatment in the Asbestos Context ........................ 463
 1. Pre–*Sisson/Grubart* Cases ................................ 463
 2. Post–*Sisson/Grubart* Cases ................................ 464
 C. Application ................................ 466
 1. Locality Test ................................ 466
 2. Connection Test ................................ 467
 a. Potentially disruptive impact on maritime commerce ................ 467

 b. Substantial relationship to traditional maritime activity .............. 469

IV. CONCLUSION ................................................ 469

## I. INTRODUCTION

Plaintiffs Lois Jean Conner, Jane Prange, James W. Stone, and Tina M. Willis ("Plaintiffs"), whose respective cases have been consolidated as part of the MDL–875 litigation, bring these asbestos products liability cases against several defendants. Plaintiffs' complaints all plead asbestos-related injuries stemming from exposure to asbestos-containing products during service with the United States Navy ("Navy"). Like many of the cases pending in this Court's MDL–875 docket arising from such exposure, the allegations concerning where and how the injuries were sustained are varied; some of the plaintiffs allege exposure whilst aboard Navy ships at sea while others emphasize exposure stemming from work in Navy shipyards.

The defendants, citing a number of bases for disposing of Plaintiffs' cases without trial, urge that summary judgment should be granted in their favor.[1] Plaintiffs disagree. Central to disposition of the pending motions is another issue that the parties vigorously dispute: what law applies in the first instance. The defendants ask the Court to apply maritime law in resolving the pending motions while Plaintiffs contend that maritime law is inapplicable.[2] Given the complexity and importance of the maritime law question to these and other cases in MDL–875, the Court will address it first in this memorandum, leaving the resolution of the other issues raised in the summary judgment motions to be addressed separately under the rubric outlined herein.[3]

As set forth below, the Court concludes that the maritime jurisdiction test requires

1. While not named as defendants in all of the cases considered in this memorandum, the following parties each seek summary judgment in at least one of the four cases discussed: General Electric Company (*Conner, Prange*). IMO Industries, Inc. (*Prange*). Buffalo Pumps, Inc. (*Prange*), Trane US, Inc. (*Prange*), Armstrong International, Inc. (*Stone*), Foster Wheeler Energy Corporation (*Prange, Stone, Willis*), Warren Pumps LLC (*Prange, Stone*), Crane Company (*Prange, Stone, Willis*), CBS Corporation f/k/a Westinghouse Electric Corporation (*Stone, Willis*), and Ingersoll–Rand Company (*Willis*). Each of these ten defendants is alleged to have manufactured defective products that caused asbestos-related disease. Specifically, General Electric Company is alleged to have manufactured defective turbines; IMO Industries, Inc. is alleged to have manufactured defective turbines, purifiers, and generators; Buffalo Pumps, Inc. is alleged to have manufactured defective pumps, Trane US, Inc. is alleged to have manufactured defective boilers; Armstrong International, Inc. is alleged to have manufactured defective steam traps; Foster Wheeler Energy Corporation is alleged to have manufactured defective boilers; Warren Pumps LLC is alleged to have manufactured defective pumps; Crane Company is alleged to have manufactured defective valves, packing, and gaskets; CBS Corporation is alleged to have manufactured defective turbines; and Ingersoll–Rand Company is alleged to have manufactured defective pumps.

2. At a hearing on the motions for summary judgment in these cases, the parties presented argument concerning whether maritime law controls these disputes. Following the hearing, the Court permitted the parties to submit supplemental legal memoranda addressing the applicability of maritime law. All but two of the defendants in these cases, Trane U.S., Inc. and Ingersoll–Rand Company, filed supplemental legal memoranda with the Court.

3. The Court has previously dealt with this issue, albeit in more cursory fashion. *See, e.g., Ferguson v. Lorillard Tobacco Co.*, No. 09–91161, doc. no. 238 (E.D.Pa. Mar. 2, 2011); *Delatte v. A.W. Chesterton Co.*, No. 09–69578, doc. no. 244 (E.D.Pa. Feb. 28, 2011).

the Court to apply maritime law to those claims involving plaintiffs who were sea-based Navy workers where the allegedly defective product was produced for use on a vessel.[4] By contrast, maritime law does not govern when the asbestos claims asserted stem from predominantly land-based Navy work even if the allegedly defective product was produced for use on a vessel. Applying this standard, the Court finds that maritime law governs the disputes in *Conner, Prange,* and *Stone* inasmuch as the injured parties in those cases were Navy sailors who spent the bulk of their time sailing on navigable waters. Because the injured party in *Willis* was a land-based Navy shipyard worker, the Court finds that maritime law does not apply and that *Willis* is therefore subject to resolution under state law.

Thus, the motions for summary judgment in *Conner, Prange* and *Stone* will be granted to the extent that they seek a ruling that maritime law applies while the motions for summary judgment seeking such a ruling in *Willis* will be denied.[5]

## II. BACKGROUND

### A. *Conner v. Alfa Laval, Inc.*

Plaintiff Jean Conner brings her action as successor-in-interest to Robert Conner, who passed away after contracting mesothelioma. Conner alleges that Mr. Conner's mesothelioma was caused by exposure to asbestos while serving as a machinist's mate aboard various Navy ships from 1962 to 1971. (Pl.'s Resp. in Opp.

to Def.'s Mot. for Summ. J., doc. no. 188, at 2.) In particular, it is Conner's position that Mr. Conner was exposed to asbestos aboard the USS Yorktown where he worked in the engine room, the auxiliary room, and the fire room. (*See* Def.'s Mot. for Summ. J., doc. no. 168, Ex. B, at 18–20.) In this capacity, Mr. Conner "maintain[ed] the equipment," "repair[ed] pumps," "remove[d] any gaskets that needed to be removed and replaced" and "fix[ed] ... any valves that were leaking from the valve stems." (*Id.* at 19.) During Mr. Conner's service aboard the USS Yorktown, the ship routinely sailed international waters before returning to dock in the Subic Bay in the Philippines. (*Id.* at 29–30.)

### B. *Prange v. Alfa Laval, Inc.*

Plaintiff Jane Prange alleges that James H. Prange contracted mesothelioma, and died, as a result of exposure to asbestos while serving in the Navy from 1965 to 1969. From 1965 to 1968, Mr. Prange served aboard the USS Pollux, which sailed international waters and transported items to other vessels at sea. (*See* Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., doc. no. 212, Ex. A, at 33–34.) Whilst aboard the USS Pollux, Mr. Prange served in the fire room, where he was responsible for cleaning and maintaining the boilers in addition to the machinery associated with running the boiler aboard the ship. (*See id.* at 43–44.) After serving on the USS Pollux, Mr. Prange spent one year aboard

---

4. The words "maritime" and "admiralty" are used interchangeably in the caselaw. *See, e.g., Sisson v. Ruby,* 497 U.S. 358, 362, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990) (equivocating between "maritime jurisdiction" and "admiralty jurisdiction"). For consistency, this memorandum uses the terms "maritime jurisdiction" and "maritime law" as opposed to "admiralty jurisdiction" and "admiralty law."

5. The Court rules in these matters via partial summary judgment because the maritime law issue was raised in the context of the pending summary judgment motions. Under different circumstances, this question may be subject to resolution via Federal Rule of Evidence 104 or a ruling on a motion *in limine.*

the USS Delta as a boiler tender. (*See id.* at 37.) The USS Delta sailed between various ports, during which time Mr. Prange would board and conduct repairs of other vessels' boilers and associated equipment. (*See id.*)

### C. *Stone v. Alfa Laval, Inc.*

Plaintiffs James and Elsie Stone allege that Mr. Stone's mesothelioma was caused by exposure to asbestos-containing products when he served as a Navy boiler tender from 1959 to 1976. (*See* Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., doc. no. 217, at 3.) Mr. Stone served aboard the USS Boxer and the USS Casa Grande. During his period of active Navy service on the USS Boxer, Mr. Stone was responsible for "maintaining the main propulsion generators and associated equipment located in the machinery spaces of the ship." (*Id.*) In addition, Mr. Stone "worked on the piping, valves and pumps, turbines, and reduction gear associated with th[e] generators." (*Id.* at 4.)

### D. *Willis v. BW IP International, Inc.*

Plaintiff Tina Willis, individually and as representative of Hiram Peavy's estate, seeks redress for Peavy's ultimately fatal mesothelioma. Willis alleges that Peavy's mesothelioma was caused by his exposure to asbestos-containing products whilst working as a shipyard worker at the Charleston Naval Shipyard. (*See* Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J., doc. no. 73, at 2–3, 29.) Peavy principally served as a machinist, performing land-based repairs to Navy equipment. (*Id.* at 2–3.) He also performed overhauls, and reinstalled equipment on Navy ships. (*Id.*)

## III. DISCUSSION

Reasoning that maritime law applies when the Court has maritime jurisdiction, *see E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986) ("With admiralty jurisdiction comes the application of substantive admiralty law."); *Gibbs ex rel. Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, 132 (3d Cir.2002) ("Since we conclude that this case sounds in admiralty, we apply federal admiralty law . . . ."), the defendants urge that maritime jurisdiction exists and ask the Court to apply maritime law to the disputes because the alleged asbestos exposure occurred when Plaintiffs were working on or around Navy ships. Plaintiffs, on the other hand, contend that maritime law does not apply in these cases because (1) the alleged injuries occurred on Navy ships, which are not within the purview of the Court's maritime jurisdiction; and (2) the work performed and the injuries sustained are not unique to maritime commerce or navigation.

■ This threshold dispute is a question of federal law, *see* U.S. Const. art. III, § 2; 28 U.S.C. § 1333(1), that is therefore governed by the law of the circuit in which the MDL court sits, *see In re Asbestos Prods. Liab. Litig. (Oil Field Cases)*, 673 F.Supp.2d 358, 362 (E.D.Pa.2009) (Robreno, J.). And it is an important one requiring cognizance of the balance between state and federal authority, because the applicability of maritime jurisdiction results in federal maritime law displacing state law.[6] *See Transamerica Delaval, Inc.*, 476 U.S. at 864, 106 S.Ct. 2295;

---

**6.** That is not to say, of course, that maritime law necessarily differs from state law in every case. In fact, in some respects, maritime law incorporates state law. *See Transamerica Delaval, Inc.*, 476 U.S. at 864–65, 106 S.Ct. 2295

("Drawn from state and federal sources, the general maritime law is an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." (internal footnote omitted)).

*Gibbs,* 314 F.3d at 132. Paying due heed to the federalism considerations lurking beneath the surface of the maritime jurisdiction inquiry,[7] the Court turns to survey comprehensively the development of maritime jurisdiction to determine whether it exists in these cases and, by extension, whether maritime law governs the parties' disputes.

### A. *Legal Standard for Determining Whether Maritime Law Applies*

The United States Constitution confers federal courts with the authority to hear "all Cases of admiralty and maritime Jurisdiction." U.S. Const. art. III, § 2. "Congress has embodied that power in a statute," *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 531, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995), affording district courts original jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases all other remedies to which they are otherwise entitled," 28 U.S.C. § 1333(1).

### 1. *Historical Development*

Historically, determining whether maritime jurisdiction existed in a tort case turned on a bright line locality test under which the only relevant question was the locus of the tort. If the tort occurred on navigable waters, "admiralty jurisdiction followed; if it did not, admiralty jurisdiction did not exist." *Grubart,* 513 U.S. at 531–32, 115 S.Ct. 1043; *see The Plymouth,* 70 U.S. 20, 36, 3 Wall. 20, 18 L.Ed. 125 (1865) ("The jurisdiction of the admiralty

does not depend upon the fact that the injury was inflicted by the vessel, but upon the locality-the high seas, or navigable waters where it occurred."). Recognizing the limitations of this approach, the Supreme Court abandoned this paradigm in *Executive Jet Aviation. Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972).

Indeed, noting the number of conceivable "cases where the maritime locality of the tort is clear, but where the invocation of admiralty jurisdiction seems almost absurd," the Court instructed that "reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law." *Id.* at 255, 261, 93 S.Ct. 493. Applying this methodology to the facts presented in that case—an aviation accident in which a plane crashed into navigable waters after striking a flock of seagulls—the Court deemed maritime jurisdiction inappropriate because the claims at issue were "only fortuitously and incidentally connected to navigable waters" with "no relationship to traditional maritime activity." *Id.* at 273, 93 S.Ct. 493.

Despite *Executive Jet*'s broad admonishment of strict adherence to the locality test, its facts left open the question of whether courts should look beyond locality outside the aviation context. The Supreme Court resolved this issue in *Foremost Insurance Company v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), unequivocally clarifying that "the *Executive Jet* requirement that the

---

**7.** The potential displacement of state law is not the only source of tension between state and federal authority in this area of law; the question of which forum should hear a maritime dispute has also required careful judicial treatment over the years. *See, e.g.,* Eduardo C. Robreno, *Learning to do Justice; An Essay on the Development of the Lower Federal Courts in the Early Years of the Republic,* 29 Rutgers L.J. 555, 565 (1998) (explaining that the constitutional grant of maritime jurisdiction to the federal courts created questions of "line drawing, as to which cases could be brought in which courts," that "tested the harmony of federal-state relations and required the expenditure of a good deal of judicial energy for many years").

wrong have a significant connection with traditional maritime activity is not limited to the aviation context." *Id.* at 674, 102 S.Ct. 2654. In doing so, the Court also expanded on *Executive Jet*'s requirement that the wrong have a relationship to traditional maritime activity. Rejecting the petitioners' argument that a substantial relationship with commercial maritime activity was necessary for maritime jurisdiction to attach, the Court explained that:

> The federal interest in protecting maritime commerce cannot be adequately served if admiralty jurisdiction is restricted to those individuals actually *engaged* in commercial maritime activity. This interest can be fully vindicated only if *all* operators of vessels on navigable waters are subject to uniform rules of conduct. The failure to recognize the breadth of this federal interest ignores the potential effect of noncommercial maritime activity on maritime commerce.

*Id.* at 674–75, 102 S.Ct. 2654. Thus, although the accident at issue merely involved a collision between two noncommercial vessels, the Court held that the requisite relationship was present and that maritime jurisdiction applied. *See id.* at 675–77, 102 S.Ct. 2654.

Expanding on the principle that potential to disrupt maritime commerce is integral to the maritime jurisdiction calculus, the Court laid the foundation for the modern maritime jurisdiction test in *Sisson v. Ruby*, 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). In *Sisson*, a fire erupted on a pleasure yacht docked in a navigable waterway. *Id.* at 360, 110 S.Ct. 2892. In addition to the requirement of a maritime locality, the Court explained that determining whether maritime jurisdiction applies requires analysis of two questions pertinent to the accident's maritime nexus: (1) the incident's potential effect on maritime commerce; and (2) the relationship between the activity giving rise to the incident and traditional maritime activity. *See id.* at 362, 367, 110 S.Ct. 2892.

The Court instructed that the first of these two inquiries is resolved by reference to "the potential impact of a given type of incident by examining its general character." *Id.* at 363, 110 S.Ct. 2892. Similarly, the Court stated that the "activity" at issue should be defined generally for the purpose of determining whether there is a sufficient relationship between the activity giving rise to the incident and traditional maritime activity. *See id.* at 365, 110 S.Ct. 2892. And, viewing the facts presented under this methodology, the Court concluded that maritime jurisdiction applied even though the vessel on which the fire started was not engaged in navigation and no commercial vessels had been docked at the marina.

First, the Court concluded that a fire on a vessel "at a marina located on a navigable waterway . . . has a potentially disruptive impact on maritime commerce." *Id.* at 363, 110 S.Ct. 2892. Second, defining the activity in that case as "the storage and maintenance of a vessel at a marina on navigable waters," *id.* at 365, 110 S.Ct. 2892, the Court concluded the requisite substantial connection to traditional maritime activity was also present because "the need for uniform rules of maritime conduct and liability is not limited to navigation, but extends at least to other activities traditionally undertaken by vessels, commercial or noncommercial," *id.* at 367, 110 S.Ct. 2892.

### 2. *Modern Standard*

The Court most recently articulated the jurisdictional standard in *Grubart*, a case in which maritime jurisdiction was contested after water from the Chicago River flooded the basement of several buildings when a crane on a barge was used to drive

new pilings into a riverbed. 513 U.S. at 530, 115 S.Ct. 1043. While acknowledging that *Sisson*'s standard controlled in instances "where all the relevant entities are engaged in similar types of activity," the *Grubart* petitioners opposed application of the *Sisson* test because "most of the victims, and one of the tortfeasors, [were] based on land." *Id.* at 544, 115 S.Ct. 1043.

Under these circumstances, the petitioners asked the Court to adopt a standard more readily limiting the application of federal jurisdiction, pointing to a test utilized by the Fifth Circuit that determined the applicability of maritime jurisdiction by "looking to 'the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law.'" *Id.* (quoting *Kelly v. Smith*, 485 F.2d 520, 525 (5th Cir.1973)). The Court recognized that the concerns espoused in support of a new standard were valid ones. *See id.* However, it emphasized that "the *Sisson* tests are aimed at the same objectives invoked to support [the] new multifactor test," and concluded that the standard set forth in *Sisson* adequately furthered those ends, *id.* at 545–46, 115 S.Ct. 1043.

■ Thus, in the wake of *Grubart*, it is clear that "a party seeking to invoke federal admiralty jurisdiction pursuant to 28 U.S.C. § 1333(1) over a tort claim must satisfy conditions both of location and of connection with maritime activity." *Id.* at 534, 115 S.Ct. 1043. The locality test requires that the tort occur on navigable waters or, for injuries suffered on land, that the injury be caused by a vessel on navigable waters. *See id.* The connection test, by contrast, contains the abovementioned two components described in *Sisson:*

> A court, first, must 'assess the general features of the type of incident involved,' to determine whether the incident has 'a potentially disruptive impact on maritime commerce.' Second, a court must determine whether 'the general character' of the 'activity giving rise to the incident' shows a 'substantial relationship to traditional maritime activity.'

*Id.* (internal citations omitted) (quoting *Sisson*, 497 U.S. at 363, 364 n. 2, 365, 110 S.Ct. 2892). The second prong of this connection test, as the *Grubart* court clarified, requires courts to focus on the tortfeasor's conduct because maritime jurisdiction is only proper if the tortfeasor's actions relate to maritime activity.[8] *See id.* at 539–40, 115 S.Ct. 1043 ("In the second *Sisson* inquiry, we ... ask whether a tortfeasor's activity ... is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand.").

B. *Caselaw Treatment in the Asbestos Context*

1. *Pre–Sisson/Grubart Cages*

Before *Sisson* and *Grubart* were decided, however, several courts considered whether maritime jurisdiction applies to asbestos-related injury claims arising from work on or around ships. As in the cases

---

8. The *Grubart* court explained, however, that the necessary relationship is satisfied as to permit maritime jurisdiction provided "at least one alleged tortfeasor was engaging in activity substantially related to traditional maritime activity and such activity is claimed to have been a proximate cause of the incident." *Grubart*, 513 U.S. at 541, 115 S.Ct. 1043. And once maritime jurisdiction is appropriate as to a claim against a particular party, jurisdiction over other defendants against whom maritime jurisdiction could not be asserted would be proper under principles of supplemental jurisdiction. *See id.* at 548, 115 S.Ct. 1043 (O'Connor, J., concurring).

at issue here and scattered across the Court's MDL–875 docket, the manner in which the alleged exposure occurred differed. Some cases involved asbestos exposure that largely occurred on land or aboard docked ships. *See Eagle–Picher Indus., Inc. v. United States*, 846 F.2d 888, 891 (3d Cir.1988) (exposure to asbestos-based insulation products during service as a sheet metal worker at the Philadelphia Naval Shipyard); *Oman v. Johns–Manville Corp.*, 764 F.2d 224, 226 (4th Cir. 1985) (exposure during work as "land-based shipyard workers for Newport News Shipbuilding and Drydock Company"); *Harville v. Johns–Manville Prods. Corp.*, 731 F.2d 775, 777 (11th Cir.1984) (exposure to plaintiffs who served as "insulators, pipe-fitters, welders, boilermakers, machinists, foreman, and general laborers in the construction and repair of vessels"). In other cases, at least a portion of the alleged asbestos exposure occurred at sea on navigable waters. *See Cochran v. E.I. duPont de Nemours*, 933 F.2d 1533, 1535 (11th Cir.1991) (exposure for a Navy sailor during active Navy service on an aircraft carrier); *Petersen v. Chesapeake & Ohio Ry. Co.*, 784 F.2d 732, 734 (6th Cir.1986) (exposure while serving as a machinist repairing equipment and machinery on car ferries "sailing between ports on the Great Lakes"); *Myhran v. Johns–Manville Corp.*, 741 F.2d 1119, 1120 (9th Cir.1984) (asbestos exposure "occurred while [the plaintiff] was employed as a pipefitter engaged in the repair and renovation of vessels on navigable waters").

Although the courts confronted with these fact patterns generally accepted that the locality test was satisfied, *see, e.g., Eagle–Picher*, 846 F.2d at 896 (noting that "a shipyard worker's claim based on an asbestos-related injury" will "normally satisf[y] the threshold 'situs' test for admiralty jurisdiction"),[9] they determined that application of maritime law was improper on the ground that the asbestos products liability claims asserted did not bear a sufficient connection to traditional maritime activity, *see Cochran*, 933 F.2d at 1538–39; *Eagle–Picher*, 846 F.2d at 896–97; *Petersen*, 784 F.2d at 736; *Oman*, 764 F.2d at 230–32; *Myhran*, 741 F.2d at 1122–23; *Harville*, 731 F.2d at 783–85; *see also Woessner v. Johns–Manville Sales Corp.*, 757 F.2d 634, 643–49 (5th Cir.1985).

Notably, however, these decisions were made under the *Kelly* framework (or a variant thereof) that the *Grubart* court expressly disavowed.[10] And because the courts' analyses hinged on "the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law," *Kelly*, 485 F.2d at 525, the key reason for rejecting maritime jurisdiction was invariably the fact that "the tasks performed and the injuries incurred by the involved workers were identical to those of asbestos workers who ha[d] never stepped aboard a vessel," *Petersen*, 784 F.2d at 736.

### 2. Post–Sisson/Grubart Cases

Of course, the fact that the work performed and the injuries sustained in sea-

---

9. *See also Oman*, 764 F.2d at 228 (finding the locality test satisfied for primarily land-based shipyard workers); *Harville*, 731 F.2d at 782 ("[A] plaintiff's claims have met the jurisdictional location requirement if the plaintiff has been exposed to asbestos on navigable waters regardless of whether he has also suffered exposures on land.").

10. As noted in Part III.A, *Grubart* confirmed the vitality of the test the Court endorsed in *Sisson* and rejected the Fifth Circuit's *Kelly* test. However, although *Sisson* was decided in 1990, the Eleventh Circuit's 1991 decision in *Cochran* did not cite *Sisson* or apply its factors.

based asbestos exposure cases may be identical to those pertaining to purely land-based work is less significant under the now-governing *Sisson/Grubart* test. *Sisson* and *Grubart*, after all, instruct that resolution of the maritime connection test simply requires inquiry into "whether the incident has a potentially disruptive impact on maritime commerce" and whether the tortious acts leading to the injury demonstrate a "substantial relationship to traditional maritime activity." *Grubart*, 513 U.S. at 534, 115 S.Ct. 1043 (internal marks omitted) (quoting *Sisson*, 497 U.S. at 364 n. 2, 365, 110 S.Ct. 2892). While this methodology is designed to weed out cases for which "the rationale for [maritime] jurisdiction does not support it," *id.* at 544–45, 115 S.Ct. 1043, its application does not result in finding maritime jurisdiction inappropriate simply because the tasks performed and injuries sustained are identical to those "of asbestos workers who ha[d] never stepped aboard a vessel," *Petersen*, 784 F.2d at 736. The post-*Sisson/Grubart* cases reflect as much.

In *Lambert v. Babcock & Wilcox, Co.*, 70 F.Supp.2d 877 (S.D.Ind.1999), for example, the court determined that maritime law governed a dispute in which a former Navy sailor was exposed to asbestos aboard a Navy vessel. *See id.* at 886. Rejecting the logic and reasoning advanced in the cases described in Part III. B.1, the *Lambert* court found that the connection test was satisfied. *See id.* at 884. Indeed, with respect to the first prong of the *Sisson/Grubart* connection test, the court explained that:

> The incident in the case at bar—asbestos exposure in the boiler room of a ship—could potentially disrupt maritime commerce by rendering the boiler room too hazardous to operate. Unsafe working conditions aboard a vessel have consistently been held to pose a potentially disruptive impact upon maritime

commerce, and this case is no exception. The operation of the boiler room is a necessary function of a vessel and its shut down would certainly disrupt the ship's operation. Moreover, asbestos-related illness could afflict other members of the crew, causing a labor shortage. Such a shortage could be exacerbated by fear of exposure by crew members and potential crew members alike.

*Id.* (internal citations omitted). And, framing the relevant activity that occurred as the "maintenance and operation of a ship's boiler room," the court concluded that the second prong of *Sisson/Grubart's* connection test was satisfied because such action is "clearly ... substantially related to traditional maritime activity." *Id.*

Similarly, in *John Crane, Inc. v. Jones*, 274 Va. 581, 650 S.E.2d 851 (2007), the Supreme Court of Virginia ruled that maritime law applied to an asbestos products liability action in which the plaintiff's asbestos exposure occurred "while repairing and constructing ships at the Newport News Shipyards." *Id.* at 854. After finding the locality prong satisfied due to the locus of plaintiff's exposure, the court disagreed with the defendant's contention that neither prong of the *Sisson/Grubart* connection test was met. *See id.* Like the *Lambert* court, the *Jones* court concluded that the "inhalation of asbestos fibers while engaged in the repair and construction of vessels on navigable waters had the potential to disrupt maritime commerce" inasmuch as injury "could potentially slow or frustrate the work being done on the vessel." *Id.*

As to the second prong of the connection test, the *Jones* court disagreed with defendant's contention that the "manufacture and sale of asbestos-containing products into the stream of commerce is too far

removed from traditional maritime activities to create the necessary relationship." *Id.* at 854–55. On the contrary, in fact, the court concluded that the defendant's involvement in traditional maritime activity was profound:

> [D]uring the time [the plaintiff] was exposed to asbestos-containing products manufactured by Crane, Crane marketed gaskets and packing material directly for the marine industry and advertised its products for 'marine engine and general ship use.' Crane also advertised its products in publications about maritime activity. This activity bore a substantial relationship to traditional maritime activities. The fact that Crane did not directly undertake any activity aboard a marine vessel does not obviate this connection.

*Id.* at 855.

Thus, although several courts have rejected the application of maritime law in asbestos products liability suits, more recent cases confirm that the earlier decisions so holding are now in tension with the standard constructed in *Sisson* and retooled in *Grubart.*

### C. *Application*

With this legal background in mind, the Court turns to apply the *Sisson/Grubart* tests to the asbestos products liability cases at issue, beginning with the locality test and then addressing the two separate prongs of the maritime connection test. As outlined below, doing so in these cases results in maritime law governing those claims involving plaintiffs who were sea-based Navy workers so long as the alleg-

edly defective product was produced for use on a vessel. Where the asbestos claims asserted stem from predominantly land-based Navy work, however, maritime law does not govern even if the allegedly defective product was produced for use on a vessel.

#### 1. *Locality Test*

■ While each of the injured parties in these cases sustained their asbestos-related injuries while working on or around Navy ships, the locality test's focus on the place of the injury suggests that inquiry into the precise location in which the injuries were suffered is necessary. Navy workers like the injured parties in these cases, however, frequently split at least some portion of their time between ships on navigable waters and land. In addition, unlike other torts, asbestos-related disease has a long latency period and plaintiffs often rely on expert testimony that all non-trivial exposures to asbestos contribute to the disease process. *See generally Harville,* 731 F.2d at 782. Thus, in the case of asbestos-related disease arising from work on or around ships, the Court concludes that the locality test is satisfied as long as some portion of the asbestos exposure occurred on a vessel on navigable waters.[11] *See id.*

■ In this case, the evidence demonstrates that the injured parties in *Conner, Prange,* and *Stone* performed their Navy service at sea aboard Navy vessels. Consequently, the locality test is satisfied as to the plaintiffs in *Conner, Prange,* and *Stone,* In *Willis,* by contrast, the record is unclear as to precisely where the alleged exposure occurred. Instead, the evidence

---

**11.** Consequently, the Court declines Plaintiffs' invitation to apply state law to some exposures and maritime law to others based on the locus of the exposure. *Cf. Bartel ex rel. Estate of Rich v. A–C Prod. Liab. Trust,* 461 F.Supp.2d 600, 602, 604 (N.D.Ohio 2006) (applying maritime law to sea-based claims and state law to land-based claims where the plaintiff was exposed to asbestos in two separate jobs, one of which was entirely land-based and one of which was entirely sea-based).

adduced merely reflects that the injured party in *Willis* was a principally land-based shipyard worker who may or may not have suffered some of the exposure alleged aboard a vessel on navigable waters.

■ Because the locality test is not satisfied if the exposure alleged occurred exclusively on land, the Court may not exercise maritime jurisdiction unless the party invoking maritime jurisdiction demonstrates, by a preponderance of the evidence, that some exposure occurred on a vessel on navigable waters. *See In re Bernstein*, 81 F.Supp.2d 176, 177 (D.Mass. 1999). The sparse evidence concerning the exposure suffered in *Willis* does not satisfy this burden. Nevertheless, for the sake of completeness, the Court assumes *arguendo* that some of the exposure in *Willis* occurred on navigable waters and turns to apply the maritime connection test to Plaintiffs' claims.

### 2. Connection Test

#### a. Potentially disruptive impact on maritime commerce

■ The Court's first task under this test is to determine whether the asbestos exposure Plaintiffs allege had a potentially disruptive impact on maritime commerce when characterizing the incidents generally.[12] *See Grubart*, 513 U.S. at 534, 115 S.Ct. 1043. In these cases, the incidents can be characterized as exposure to allegedly defective products on or around Navy ships. Viewed in this light, the Court concludes that the incidents plainly had a potentially disruptive impact on maritime commerce as to the injured parties in *Conner, Prange*, and *Stone*. All three, after all, served aboard Navy vessels that routinely sailed and docked on navigable waters.[13] They were effectively sailors, whose job was to maintain equipment that was integral to the functioning of the ships on which they served. *See Tritt v. Atl. Richfield Co.*, 709 F.Supp. 630, 632 (E.D.Pa.1989). Under such circumstances, exposure to defective products could "potentially slow or frustrate the work being done on the vessel." *Jones*, 650 S.E.2d at 854.

Indeed, exposure to defective products creates unsafe working conditions that could cause labor shortages on the ships due to injuries sustained aboard. *See Lambert*, 70 F.Supp.2d at 884. And a shortage of this nature "could be exacerbated by fear of exposure by crew members and potential crew members alike."[14]

---

**12.** As set forth more specifically *supra* in note 1, Plaintiffs allege they sustained asbestos-related injuries due to defective turbines, pumps, purifiers, generators, boilers, valves, gaskets, packing, and steam traps manufactured by the defendants in these cases.

**13.** Plaintiffs, however, pointing to dicta from *The Eagle*, 75 U.S. 15, 8 Wall. 15, 19 L.Ed. 365 (1868), contend that maritime jurisdiction cannot attach because the injuries were sustained on or around Navy ships and the Navy is not engaged in maritime commerce. *See id.* at 23 ("[T]he vessels engaged in making the seizure, as prize of war, which are ships of the navy, or privateers, are not employed at the time, in the business of commerce and navigation."). The Court dis-

agrees. Indeed, as *Sisson* and *Grubart* make clear, vessels need not be directly involved in maritime commerce at all for maritime jurisdiction to apply so long as the incident at issue has a potentially disruptive impact on maritime commerce. In *Sisson*. the Court held that this standard was met where a fire erupted on a noncommercial vessel that was docked in a marina that contained no commercial vessels. *See Sisson*, 497 U.S. at 360, 110 S.Ct. 2892. It is nearly self-evident that, depending on the circumstances, incidents on Navy ships could also have a potentially disruptive impact on ships engaged in maritime commerce.

**14.** Indeed, even if the Court defined the activity more narrowly as exposure to asbestos-

*Id.* Any such occurrence would disrupt the Navy's ability to protect other commercial ships at sea if called upon to do so.

Moreover, the allegedly defective products in these cases were often insulated with asbestos or incorporated with asbestos-containing component parts to prevent fires aboard ships. *See Johns–Manville Corp. v. United States,* 855 F.2d 1571, 1571 (Fed.Cir.1988) ("Due to the heat resistant and fire retardant properties of asbestos it was used in insulating ships' boilers, steam pipes, pumps, and other equipment."); *Tritt,* 709 F.Supp. at 632. Fire, as the Supreme Court recognized in *Sisson,* is "one of the most significant hazards facing commercial vessels." *Sisson,* 497 U.S. at 362, 110 S.Ct. 2892. With fewer workers available to work with equipment in which asbestos was used for heat resistance, a fire could erupt and disrupt commercial vessels. *See id.* at 363, 110 S.Ct. 2892.

■ But while the potentially disruptive impact on maritime commerce is clear with respect to the injured parties in *Conner, Prange* and *Stone* due to their status as sea-based Navy workers, the facts in *Willis* present a much different question. Indeed, unlike the other injured parties discussed in this memorandum, Peavy was a predominantly land-based worker. In such instances, the Third Circuit has instructed that maritime jurisdiction is inappropriate. *See Eagle–Picher,* 846 F.2d at 896 ("[A] shipyard worker's claim based on an asbestos-related injury does not bear a sufficient connection to traditional maritime activity."). And, as discussed earlier, several other courts of appeals have reached the same conclusion.

Of course, as the defendants point out, the Third Circuit and various other courts decided as much under the *Kelly* framework that was rejected by the Supreme Court in *Grubart.* Depending on this logic and reasoning that maritime jurisdiction is appropriate in *Willis* under the current standard, the defendants ask the Court to apply maritime law notwithstanding *Eagle–Picher* and like cases. The Court agrees with the defendants that the *Sisson/Grubart* connection test more readily permits maritime jurisdiction in asbestos products liability cases stemming from work on or near ships than *Kelly* would allow. Nevertheless, the Court concludes that state law governs claims arising from predominantly land-based Navy work because a predominantly land-based Navy worker's exposure to defective products on or near ships does not have a potentially disruptive impact on maritime commerce.

Indeed, by serving in a Navy shipyard, such workers are more removed from maritime commerce than their sea-based Navy counterparts. For example, the prospect of injuries to predominantly land-based workers is less likely to disrupt maritime commerce because such workers would not be at sea to defend commercial ships if necessary. In fact, some portion of the work performed by such workers is not even undertaken on navigable waters at all. It is, of course, evident that the unsafe working conditions caused by exposure to defective products could conceivably cause some of the same disruptions to maritime commerce described with respect to the sea-based Navy workers in *Conner, Prange,* and *Stone.* This is not sufficient for maritime jurisdiction to attach; the exposure must pose "more than a fanciful

containing products on or around Navy ships, it would still conclude that such exposure had a potentially disruptive impact on maritime commerce as to the parties in *Conner, Prange,* and *Stone.* While asbestos-related diseases

often have long latency periods, any workers with knowledge of the dangers of asbestos may have refused to work thereby causing labor shortages that could potentially disrupt maritime commerce.

risk to commercial shipping," *Grubart,* 513 U.S. at 539, 115 S.Ct. 1043, and here the potential impact on maritime commerce is simply too attenuated.

Thus, although the asbestos exposure alleged had a potentially disruptive impact on maritime commerce with respect to the injured parties in *Conner, Prange,* and *Stone,* the Court concludes that the exposure to the injured party in *Willis* did not have a potentially disruptive impact on maritime commerce. Consequently, maritime jurisdiction does not apply to the claims asserted in *Willis.* To determine whether it does apply in *Conner, Prange,* and *Stone,* the Court turns to examine whether the activity giving rise to the incident demonstrates a substantial relationship to traditional maritime activity.

### b. Substantial relationship to traditional maritime activity

■ The Court's role in this regard is to assess whether the "tortfeasor's activity ... is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Grubart,* 513 U.S. at 539–40, 115 S.Ct. 1043. Viewing the activity generally as the Court must, *see Sisson,* 497 U.S. at 364, 110 S.Ct. 2892, the Court finds that the activity engaged in by the numerous defendants in these cases was the manufacture of products for use on vessels.

Indeed, unlike the asbestos manufacturers who were defendants in many of the prior cases deciding whether maritime jurisdiction applies to asbestos products liability claims, *see supra* Part III.B.1, the products manufactured in these cases— turbines, pumps, purifiers, generators, boilers, valves, gaskets, packing, and steam traps—were essential for the proper functioning of ships and made for that purpose. The Court therefore concludes that their allegedly defective production bears a substantial relationship to traditional maritime activity. *See Jones,* 650 S.E.2d at 855 (holding the substantial relationship prong of the connection test was satisfied because the defendant's products were produced and advertised for the marine industry).

Consequently, the claims in *Conner, Prange,* and *Stone* are within the Court's maritime jurisdiction and therefore subject to resolution under maritime law.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that maritime law governs the disputes in *Conner, Prange* and *Stone,* but not the dispute in *Willis.* Consequently, the motions for summary judgment in *Conner, Prange,* and *Stone* will be granted to the extent they seek application of maritime law and maritime law will be applied in resolving the other issues raised in the summary judgment motions. The motions for summary judgment in *Willis* will be denied inasmuch as they ask the Court to apply maritime law and *Willis* will therefore be resolved under applicable state law. An appropriate Order will follow.

### *ORDER*

**AND NOW,** this 21st day of **July 2011** it is hereby **ORDERED** that Defendants' motions for summary judgment listed in Exhibit A are **GRANTED in part** on the issue of the application of maritime law. The Court hereby finds that maritime law applies in the cases listed in Exhibit A;

It is hereby further **ORDERED** that Defendants' motions for summary judgment in *Willis,* 09–91449 listed in Exhibit B are **DENIED in part** on the issue of the application of maritime law. The Court hereby finds that state law applies in *Willis.*

**AND IT IS SO ORDERED.**

*Exhibit A*

| HONORABLE EDUARDO C. ROBRENO | | |
|---|---|---|

| Case number/<br>Document<br>number | Case and Motion Information | Notes |
|---|---|---|
| *2:09–cv–67099–ER* | **CONNER et al v. ALFA LAVAL,<br>INC. et al**<br>*Case filed*: 05/07/2009 | *Cause*: 28:1332 Diversity–<br>Asbestos Litigation<br>*NOS*: 368<br>*Office*: Philadelphia<br>*Jurisdiction*: Diversity<br>*Presider*: EDUARDO C.<br>ROBRENO<br>*Settlement*: DAVID R.<br>STRAWBRIDGE<br>*Jury demand*: Both<br>Case flags: ASBESTOS, CA–C,<br>CASREF/ASB, DS/ASB, MDL–<br>875 |
| 177 | MOTION for Summary Judgment<br>*Motion filed*: 08/11/2010<br>*Filed by*: GENERAL<br>ELECTRIC COMPANY | *Response due*: 04/15/2011<br>*Response filed*: 03/17/2011<br>*Reply filed*: 09/08/2010 |

| Case number/<br>Document<br>number | Case and Motion Information | Notes |
|---|---|---|
| *2:09–cv–91848–ER* | **PRANGE et al v. ALFA LAVAL,<br>INC. et al**<br>*Case filed*: 11/02/2009 | *Cause*: 28:1332 Diversity–<br>Asbestos Litigation<br>*NOS*: 368<br>*Office*: Philadelphia<br>*Jurisdiction*: Diversity<br>*Presider*: EDUARDO C.<br>ROBRENO<br>*Settlement*: M. FAITH ANGELL<br>*Jury demand*: Defendant<br>*Case flags*: ASBESTOS, CA–C,<br>CASREF/ASB, MDL–875, MFA/<br>ASB |
| 162 | MOTION for Summary Judgment<br>*Motion filed*: 10/25/2010<br>*Filed by*: IMO INDUSTRIES,<br>INC. | *Response filed*: 03/17/2011<br>*Reply filed*: 01/14/2011 |
| 163 | MOTION for Summary Judgment<br>*Motion filed*: 10/25/2010<br>*Filed by*: GENERAL<br>ELECTRIC COMPANY | *Response filed*: 03/18/2011<br>*Reply filed*: 01/21/2011 |
| 164 | MOTION for Summary Judgment,<br>*or in the alternative, partial<br>summary judgment*<br>*Motion filed*: 10/25/2010<br>*Filed by*: BUFFALO PUMPS,<br>INC. | *Response filed*: 04/26/2011<br><br>*Reply filed*: 01/14/2011 |

| | | |
|---|---|---|
| 165 | MOTION for Summary Judgment *or, in the Alternative, Summary Adjudication* *Motion filed*: 10/25/2010 *Filed by*: IMO INDUSTRIES, INC. | *Response filed*: 03/17/2011 |
| 166 | MOTION for Summary Judgment, *or in the alternative, partial summary judgment* *Motion filed*: 10/25/2010 *Filed by*: TRANE US, INC. | *Response filed*: 03/17/2011 *Reply filed*: 01/14/2011 |
| 181 | MOTION for Summary Judgment *Motion filed*: 10/25/2010 *Filed by*: FOSTER WHEELER LLC | *Response filed*: 04/01/2011 *Reply filed*: 04/26/2011 |
| 184 | MOTION for Summary Judgment *Motion filed*: 10/25/2010 *Filed by*: WARREN PUMPS, LLC. | *Response filed*: 03/18/2011 *Reply filed*: 01/14/2011 |
| 191 | MOTION for Summary Judgment *Motion filed*: 10/25/2010 *Filed by*: CRANE CO. | *Response filed*: 04/01/2011 *Reply filed*: 01/14/2011 |

| Case number/ Document number | Case and Motion Information | Notes |
|---|---|---|
| *2:09–cv–93726–ER* | **STONE et al v. ALFA LAVAL INC. et al** *Case filed*: 12/16/2009 *Case reopened*: 09/01/2010 | *Cause*: 28:1332 Diversity– Asbestos Litigation *NOS*: 368 *Office*: Philadelphia *Jurisdiction*: Diversity *Presider*: EDUARDO C. ROBRENO *Settlement*: THOMAS J. RUETER *Jury demand*: None *Case flags*: ASBESTOS, CA–S, CASREF/ASB, MDL–875, TJR/ ASB |
| 168 | MOTION for Summary Judgment *and Certificate of Service* *Motion filed*: 11/05/2010 *Filed by*: ARMSTRONG INTERNATIONAL, INC. | *Response filed*: 03/17/2011 *Reply filed*: 04/18/2011 |
| 171 | MOTION for Summary Judgment *and Notice of Motion for Sum- mary Judgment* *Motion filed*: 11/05/2010 *Filed by*: CBS CORPORATION | Response filed: 03/17/2011 *Reply filed*: 04/26/2011 |
| 174 | MOTION for Summary Judgment Notice *Motion filed*: 11/05/2010 *Filed by*: FOSTER WHEELER ENERGY CORPORATION | *Response filed*: 04/01/2011 |
| 181 | MOTION for Summary Judgment *Motion filed*: 11/05/2010 | Response filed: 03/18/2011 Reply filed: 01/03/2011 |

*Filed by*: WARREN PUMPS
LLC

| | | |
|---|---|---|
| *199* | MOTION for Summary Judgment<br>*Motion filed*: 11/05/2010<br>*Filed by*: CRANE CO. | Response filed: 04/01/2011<br>*Reply filed*: 01/03/2011 |

*Exhibit B*

| Case number/<br>Document<br>number | Case and Motion Information | Notes |
|---|---|---|
| *2:09–cv–91449–ER* | **WILLIS et al v. BW IP INTERNATIONAL INC. et al**<br>*Case filed*: 10/15/2009 | *Cause*: 28:1332 Diversity–Asbestos Litigation<br>*NOS*: 368<br>*Office*: Philadelphia<br>*Jurisdiction*: Diversity<br>*Presider*: EDUARDO C. ROBRENO<br>*Jury demand*: None<br>*Case flags*: ASBESTOS, MDL–875, SC |
| *57* | MOTION for Summary Judgment<br>*Motion filed*: 12/23/2010<br>*Filed by*: INGERSOLL–RAND COMPANY | Response filed: 04/15/2011<br>*Reply filed*: 02/07/2011<br>*Hearing set*: 03/22/2011 |
| *58* | MOTION for Summary Judgment<br>*and Brief in Support*<br>*Motion filed*: 12/23/2010<br>*Filed by*: INGERSOLL–RAND COMPANY | *Response filed*: 04/15/2011<br><br>*Reply filed*: 02/07/2011<br>*Hearing set*: 03/22/2011 |
| *59* | MOTION for Summary Judgment<br>*Motion filed*: 12/23/2010<br>*Filed by*: FOSTER WHEELER ENERGY | *Response due*: 02/15/2011<br>*Reply filed*: 04/15/2011<br>*Reply filed*: 04/26/2011<br><br>*Hearing set*: 03/22/2011 |
| *60* | MOTION for Summary Judgment<br>*Motion filed*: 12/23/2010<br>*Filed by*: CBS CORPORATION | *Response filed*: 04/15/2011<br>*Reply filed*: 04/26/2011<br>*Hearing set*: 03/22/2011 |
| *61* | MOTION for Summary Judgment<br>*Motion filed*: 12/23/2010<br>*Filed by*: CRANE CO | *Response filed*: 04/15/2011<br>*Reply filed*: 02/16/2011<br>*Hearing set*: 03/22/2011 |